# ROSE LIPINSKI AND OTHERS v. MARTIN LIPINSKI AND ANOTHER.[1]

January 28, 1949.

No. 34,752.

[1]Reported in 35 N. W. (2d) 708.

512

*John R. Foley,* for appellants.

*Stafford & Stafford, G. L. Pattison,* and *John J. Sexton,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying a new trial in an action for the dissolution of a partnership and an accounting.

Prior to his death on June 15, 1943, Mike Lipinski, a commercial fisherman, was the owner of some real estate on the shores of Lake Pepin in Wisconsin. Situated on this land were a commercial fish pond, icehouse, packing shed, and dwelling used in connection with the business. On or about April 15, 1943, defendant Martin Lipinski, Mike's brother, and one Henry C. Jezewski entered into an oral agreement with Mike for the use of the property owned by the latter and for the commercial fishing of the waters of Lake Pepin and the furnishing of capital for the activity. Pursuant to this oral agreement, fishing operations were commenced and carried out during the summer of 1943, before as well as after Mike's death on June 15 of that year. It appears that Martin and a crew did most of the actual work of fishing; that Jezewski furnished some of the capital, but was not too active in the fishing operations, which consisted principally of seining carp, buffalo, and other commercial fish for the market.

The operations continued after Mike's death without a written agreement until November 24, 1943. On that date, plaintiffs, who are the heirs at law of Mike Lipinski, entered into a written agreement with Martin and Jezewski. Among other things, in this agreement plaintiffs demised and let to Martin and Jezewski, as parties of the second part, the real estate owned by Mike's estate, including the commercial fish pond, icehouse, packing shed, and dwelling, for a term of four years from April 15, 1943. The second parties agreed to keep and maintain the premises in as good condition as they were on April 15, 1943, and to pay all minor repairs and upkeep,

which was to be an expense of the fishing operations. Mike's heirs were to make any permanent improvements to structures at their own expense. The second parties to the agreement agreed also to properly and aggressively fish the waters of Lake Pepin, to supervise and manage the fishing operations, to hire all necessary employes in the conduct of the business, and to deliver to and market from the leased premises all fish caught. They agreed also to sell such fish to the best advantage of all parties, to pay all expenses incurred in the operation of the enterprise, including wages, from the gross receipts of fish sold, and to keep accurate account books of fish caught or disposed of and disbursements made in the operations. It was also agreed that they were to furnish and use in the operations any nets or equipment they then owned without charge, but that any repairs or replacements should be paid as an expense of operation of the enterprise, and that at the expiration of the term all nets or other equipment on hand would become the property of all the parties in the proportions set forth in the agreement. It was also provided that on December 1 and April 15 of each year during the term of the agreement an accounting would be made, and that the receipts from the fishing operations, less expenses, should be divided one-fourth to plaintiffs and three-fourths to the second parties, except that $2,000 was to be retained in the business from such receipts for working capital. The agreement also contained certain provisions incidental to operation of the business and change of personnel, not particularly material in connection with this case.

For many years prior to 1943, a narrow strip of land adjoining the Mike Lipinski property and owned by one Bengtson had been used as a "haul" by Mike in connection with his fishing operations. This land is a narrow strip along the shore of the lake consisting of about 3.61 acres adjacent to and north of Mike's land, now owned by plaintiffs. In November 1943, about nine days prior to the time Mike's heirs entered into the agreement with Martin and Jezewski, Martin purchased this strip of land from Bengtson. This

action arose, among other things, out of a dispute in connection with this purchase.

At the time Martin purchased the land from Bengtson, he drew a check for $200 out of the commercial fishing funds and charged the amount to himself. It had been Martin's practice to withdraw funds from time to time in advance of the division of profits, and any such advancements were deducted from his share of the profits at the next accounting. The withdrawal of the $200 was made on or about November 15, 1943, at which time Bengtson and his wife conveyed the strip of land in dispute to Martin and his wife, defendants in this action. The books of the fishing enterprise showed only that the check was drawn for Martin's personal use and did not show the purpose for which the money was used. The land purchased by defendants from Bengtson had been used from the time of Mike's death, and prior thereto, in connection with the commercial fishing operations of the parties, and continued in use up to the end of such operations in 1946. Martin contends in his testimony that at the time he bought this real estate he did not try to keep it a secret from anyone; that he had suggested several times to some of his associates that they should buy some of this land along the lake, because if they did not someone else would get it, but that "they didn't seem to pay any attention to it." However, he admitted on cross-examination that he did not say anything about acquiring this particular land from Bengtson at the time he signed the contract with plaintiffs on November 24, 1943. He explained that his reason for acquiring the land at the time he did was because some of the plaintiffs had suggested that one or more of the parties to the fishing operations be let out so that the profits would be greater for those remaining; that he was not in favor of such a change and feared that he would be the next one to be let out; and that he thought it would be desirable for him to acquire the land so that it would be less convenient for the others to oust him.

Plaintiffs contend that Martin purchased this land (which they claim was very desirable for use in connection with the business)

without their knowledge, approval, or consent, and that he paid for it out of commercial fishing funds without disclosing on the books the purpose of the expenditure or that the check was made payable to Bengtson.

Plaintiffs raised the questions on appeal as to whether the relationship between the parties to the fishing enterprise was that of a partnership or joint venture; whether there was a fiduciary relation between the parties at the time of the purchase of the land; whether Martin purchased the land in violation of his obligations to his associates arising out of any relationship of mutual trust and confidence; and whether defendants are constructive trustees of the title to the land in question.

The trial court found that Martin became associated in a commercial fishing enterprise with his brother Mike in March 1943; that the enterprise was continued after the death of Mike under an informal arrangement with his widow and children for a time, and that on November 24, 1943, the rights and relations of the parties were defined and established by a written agreement; that defendants purchased the land in dispute from Bengtson on November 15, 1943, for $200; that the money was derived from the fishing enterprise, but was withdrawn by Martin for his own use; that although the land in dispute had been used for many years by Mike, and after his death by the parties to this action, in connection with their commercial fishing enterprise, none of these persons ever had any right, title, or interest in the land, nor had any of them ever claimed any right, title, or interest until title was acquired by defendants. Thereupon, the court concluded that plaintiffs were not entitled to any remedy or relief.

In its order of March 25, 1948, the court partially amended paragraph 4 of its findings, to the effect that a proper accounting of the $200 withdrawn by Martin had been made to his associates, and substituted a finding that an entry was made by him in the account books of the enterprise which showed that the withdrawal was charged to him; "that he made other withdrawals, both before and after said $200 item, and entered the same in like manner in

said account book; and that all such entries were allowed and deducted from his share, without objection, when the parties examined the book at the end of each year."

In its memorandum attached to the order, the court said in part that it seemed clear that the relationship between the parties was fiduciary in character and that each owed to the others the highest degree of loyalty and good faith. *"Such relationship and its obligations, however, were limited to the enterprise in which they were mutually engaged."* The trial court then went on to say:

"* * * In determining their respective obligations, a court should always keep in mind the purposes for which the participants were associated and the manner in which the association was organized— * * *

"It should be remembered that the defendant contributed no land to the enterprise, and was to receive no interest in land upon its termination. This, alone, is not determinative; but it is an important consideration in discovering his duty toward the others, * * *. The defendant stood in the position of a lessee; the other parties were his landlords. The land was theirs to begin with, and it was to be theirs when the enterprise terminated.

"The defendant did not acquire any land that his associates owned. They had no right, title or interest in the disputed strip (called the haul), and they had made no plans to lease it, or buy it, or to acquire any easement or other right in it. * * *

"* * * The agreement, by its terms, covered only land the record title of which was in the name of M. N. Lipinski."

The court further said in its memorandum that this was a fishing enterprise and not an undertaking to acquire land, or to improve or develop real estate, or to sell or lease land to others, and that the association was limited to a term of four years. It also said:

"The defendant did not buy the haul as the result of any information, priority, or advantageous position which he had obtained by virtue of the joint enterprise. He merely went up the hill and bought it. Any of the others could have done the same. He violated

no confidence; he had no advantage in a race—the others were not intending to buy it. The vendors did not come to him because he was in charge. He sought them himself.

"The haul was not purchased with partnership funds. The defendant withdrew the sum of $200 and charged the withdrawal to himself on the partnership books. Other withdrawals, for his personal use, were made in the same manner. The amount was not large enough to impoverish or jeopardize the enterprise. It was deducted from the defendant's share, in the same manner as the other withdrawals, upon the annual accounting; and there was no objection. If he had used it for any other purpose, there would have been no complaint later. It was essentially his money. * * *"

With reference to the issue raised by plaintiffs as to whether the relationship between the parties was that of a partnership or joint venture, it is somewhat difficult to determine from the agreement of November 24 just what kind of a deal the parties intended to make. It is somewhat in the nature of a lessor-lessee arrangement, in that plaintiffs demised and let to Martin Lipinksi and Jezewski the real estate described in the agreement, and somewhat in the nature of a partnership or joint venture, in that Martin and Jezewski were to carry on, supervise, and manage the fishing operations, pay expenses from the gross receipts, and furnish certain equipment without charge. An accounting was to be made on December 1 and April 15 of each year, and receipts from the fishing operations, less expenses, were then to be divided one-fourth to plaintiffs and three-fourths to Martin and Jezewski, with certain exceptions unimportant here as to changes in personnel. Assuming, however, that it was the intention of the parties to make the deal a partnership or joint venture, we cannot see under the facts of the case how it can change the decision, because, as we see it, the real issue is whether the purchase of the 3.61 acres by Martin was a violation of a fiduciary duty which he owed plaintiffs so as to impose a constructive trust upon the property for the benefit of the parties to the agreement.

The action was tried to the court without a jury, and the court concluded that plaintiffs were not entitled to any remedy or relief.

On appeal from a decision of a trier of fact, the testimony must be considered in the light most favorable to the prevailing party. Bloomquist v. Thomas, 215 Minn. 35, 39, 9 N. W. (2d) 337, 340; Leitner v. Pacific Gamble Robinson Co. 223 Minn. 260, 26 N. W. (2d) 228.

■ It is a well-established rule of this court that when an action is tried by a court without a jury its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence. This rule applies whether the appeal is from a judgment or from an order granting or denying a new trial. See, 1 Dunnell, Dig. & Supp. § 411, and the long line of Minnesota decisions there cited.

■ M. S. A. 323.02, subd. 8, defines a partnership as follows:

"A partnership is an association of two or more persons to carry on as coowners a business for profit."

In discussing the question of the duties of partners toward each other, this court said in Kitzman v. Postier & Kruger Co. Inc. 204 Minn. 343, 346, 283 N. W. 542, 543:

"We may accept as valid plaintiff's statement of the law, that each of the parties to this cause occupies to the other a position of trust and as such 'must exercise the most scrupulous good faith toward each other.' Hence, 'in any dispute touching any transaction by which one partner seeks to benefit himself at the expense of the firm, he is required to show, not only that "he has law on his side, but that his conduct will bear to be tried by the highest standard of honor." ' McAlpine v. Millen, 104 Minn. 289, 300, 116 N. W. 583, 587. And we consider it immaterial whether the relationship was that of a general partnership or, as determined by the court, a joint enterprise. Obviously, the same rule should apply in either case. 'A joint adventure can arise only by contract or agreement between the parties to join their efforts in furtherance of a

particular transaction or series of transactions. And in the absence of express limitations in that respect each party to such adventure is subject to all losses and liabilities, and entitled to share equally in the profits of the undertaking. The relationship is substantially that of a copartnership.' National Surety Co. v. Winslow, 143 Minn. 66, 71, 173 N. W. 181, 183; Mechem, 'The Law of Joint Adventures,' 15 Minn. L. Rev. 644."

If we are to assume in the case at bar that the agreement of November 24, 1943, between the parties created a copartnership or joint venture relationship, it seems clear under the law that such relationship was fiduciary in character and that each of the parties to the agreement owed to the others the highest degree of good faith. Section 323.20 provides:

"Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

In Venier v. Forbes, 223 Minn. 69, 74, 25 N. W. (2d) 704, 708, we held "that the relationship between partners is essentially one of mutual trust and confidence and that the law imposes upon them the highest standard of integrity and good faith in their dealings with each other."

It is true that a constructive trust will arise where an interest in property is purchased by one standing in a fiduciary relation to another where the scope of the former's obligation as a fiduciary is closely connected with the transaction. 3 Scott, Trusts, § 504. This rule is based on equity and good conscience, for a fiduciary should not be allowed to profit by exploiting those who have placed their trust and confidence in him, but the rule should not be interpreted so as to deprive the fiduciary of the power to invest his money in good faith in other profitable ventures. See, Shrader v. Downing, 79 Wash. 476, 478, 140 P. 558, 559, 52 L.R.A. (N.S.) 389. Consequently, it has been held that, while a lease held by a partner-

ship and the right to renew it are partnership assets, the title of a landlord is not so adverse to that of his tenant as to prevent a partner from purchasing the fee to the premises which the partnership leased, provided he practices no fraud or deception upon his copartners and holds his fee subject to the lease for the duration thereof. Thanos v. Thanos, 313 Ill. 499, 145 N. E. 250; Sonek v. Hill B. & L. Assn. 138 N. J. Eq. 534, 49 A. (2d) 303, affirmed, 140 N. J. Eq. 108, 52 A. (2d) 852; Anderson v. Lemon, 8 N. Y. 236, affirming 4 N. Y. Sup. Ct. (Sandf.) 552.

We now come to the question whether the 3.61 acres of land involved in this litigation should be considered partnership property and accounted for in the partnership assets. The trial court found that it was not; that defendants purchased the land from Bengtson with money withdrawn by Martin Lipinski for his own use; and that a proper accounting of such money had been made to his associates. The trial court further said in its memorandum that it seemed clear that the relationship between the parties was fiduciary in character and that each owed to the others the highest degree of loyalty and good faith, but that such relationship and its obligations were limited to the enterprise in which they were mutually engaged. It is our opinion that this is correct.

It must be considered in reviewing the agreement of November 24 that the purpose for which the parties entered into it was to conduct and continue to carry on a fishing enterprise consisting primarily of fishing the waters of Lake Pepin for commercial purposes with the object of making a profit. We can find nothing in this agreement to indicate that the acquisition of additional real estate was one of the objects or purposes of the business. The land described in the contract of November 24 was that belonging entirely to plaintiffs, and it was to remain theirs at the termination of the agreement. The undertaking involved was definitely that of a fishing enterprise and not one involving the acquisition, improvement, or development of real estate. It was limited to four years, and there was no provision for any renewal. It is true that the land acquired by defendants, referred to as the "haul," was used in con-

nection with the fishing enterprise, but it appears from the record that some of the parties to the agreement at least had been familiar with the fact, for a long time before this action was commenced, that Martin had acquired this land, and that they had shown no interest in acquiring it for themselves, either before or for some time after Martin received title.

We have carefully considered the record with the object of determining whether Martin took any undue advantage of plaintiffs in acquiring this land without their knowledge. He claims that he requested his associates to acquire this land from Bengtson for fear it would be purchased by a stranger who would forbid the use of it by the parties, but that this urging was of no avail. Plaintiffs contend that Martin knew that this property was not owned by his brother Mike, and that without their knowledge, approval, or consent he purchased this property from Bengtson out of business enterprise funds. The record shows that at least some of the plaintiffs knew long before this action was commenced that Martin had acquired this property, as evidenced by an agreement dated December 1, 1943, between Andrew Lipinski and plaintiff Richard Lipinski, coadministrators of their father's estate, and Martin. This was about a week after the agreement of November 24 was signed, and by it Martin gave the administrators an option to buy back this strip of land for $200, the original purchase price, upon payment to him of a claimed indebtedness of $2,900. However, it appears that Martin never filed a claim for this indebtedness against the estate of his brother Mike. That agreement is not a part of the dispute now before us, but is merely evidence of the knowledge on the part of at least one plaintiff, a brother of the other plaintiffs, that Martin had acquired this land. No rent was paid to Martin for the first two years he owned this property, although it was used in the fishing operations. However, plaintiffs were aware that Martin claimed this property as his own, for at the accountings in 1944 and 1945 Martin requested rent for use of the land by the association, and plaintiffs refused to pay rent because of lack of funds. It appears that Martin was given an additional 15 percent dividend in the net

proceeds from the operations in 1946, and he claims that this was paid as rent for the use of the land. Plaintiffs, on the other hand, testified that this 15 percent increase in Martin's share was given him for one Klingsmith, an employe of the association and not a party to the contract, to compensate Klingsmith for contributions of equipment which he had made. The $200 withdrawn by Martin to purchase the land was accounted for and charged to his account at one of the accounting meetings. The four-year term of the lease was about to expire when this action was commenced. The trial court stated in its memorandum that Martin did not buy the land involved as the result of any information, priority, or advantageous position which he had obtained by virtue of the joint enterprise. "He merely went up the hill and bought it. Any of the others could have done the same. He violated no confidence; he had no advantage in a race—the others were not intending to buy it."

Plaintiffs particularly emphasize in their brief that the property involved should be accounted for in the accounting and dissolution because it was purchased with partnership funds, and they cite the case of State v. MacGregor, 202 Minn. 579, 279 N. W. 372. It appears to us that that case is not in point. In that case it was held that indictments for forgery against a partner for making false entries in the partnership books for the purpose of defrauding a partner by concealing a misappropriation of partnership funds stated public offenses under the statute. Here, there is no showing that the $200 used by Martin was misappropriated. The record shows that it was charged to his account and deducted from his share of the profits, and that this information was available to all the parties.

After carefully reviewing the record and under our rules in previous cases, we find it necessary to sustain the findings and conclusions of the trial court.

Affirmed.