WILLIAM A. McDONALD AND ANOTHER v.
WESTERN UNION TELEGRAPH COMPANY, INC.,
AND OTHERS.
CITY OF MINNEAPOLIS, APPELLANT.

84 N. W. (2d) 630.

August 9, 1957—No. 37,097.

*Charles A. Sawyer,* City Attorney, and *Raymond H. Hegna,* Assistant City Attorney, for appellant.

*Trench & Benson,* for respondents McDonald.

*Coursolle, Preus & Maag,* for respondent Western Union.

*Robert C. Gove,* for respondent Victor Carlson & Sons, Inc.

NELSON, JUSTICE.

A suit was commenced by William A. McDonald and Elizabeth McDonald, his wife, against Western Union Telegraph Company, Inc., Victor Carlson & Sons, Inc., and the city of Minneapolis to recover for damages to his automobile resulting from a collision with a raised manhole and also for personal injuries received therein by Elizabeth McDonald. The defendants above named will be referred to hereinafter as Western Union, Carlson & Sons, and the city of Minneapolis.

During the year 1954, the city of Minneapolis embarked upon a program of resurfacing several of its streets in the downtown section in order to cover streetcar tracks. In carrying out this program, the city raised the grade of those streets approximately 3 inches and also raised the level of the manholes owned and maintained by the city. As a part of the aforesaid program the city of Minneapolis requested that all of the utility companies raise their respective man-

holes approximately 3 inches before the application of the blacktop resurfacing material. On June 25, 1954, the city engineer of the city of Minneapolis made a request in writing to Western Union as follows:

"We are now in the process of resurfacing over the streetcar tracks on various streets in the downtown business section of the City. The execution of this resurfacing program involves many operations by City and public utility crews. We feel sure that you fully appreciate the need for close cooperation between our City forces and your crews, in order that the work can be accomplished with a minimum interference with traffic.

"Traffic conditions are very critical at certain intersections in the downtown business area. The partial blocking of these intersections for operations such as resetting manholes can cause a great deal of confusion and the piling up of traffic for several blocks. For this reason, we request that your company make arrangements to do any work, such as resetting manholes, requiring a day or less to complete, on Saturday afternoons or Sundays or holidays in any intersections involving Hennepin, Nicollet, Marquette, and 2nd Avenues between Washington Avenue and 10th Street.

"Your cooperation in this request will be very much appreciated and will materially help all of us in our general relations with the public affected by these improvements."

The letter was signed by Hugo G. Erickson, city engineer, by Gordon E. Bodien, paving engineer.

The city of Minneapolis planned to apply about 3 inches of blacktop on the street surface of First Avenue North between 6th Street and 7th Street North and, before proceeding to do so, informed Western Union that it should raise its manhole No. 69 located on that street approximately 3 inches to accommodate the change of grade. While Western Union was raising its manholes as requested by the city, its contractor, Carlson & Sons, erected barricades around the locations of these manholes, but these barricades were removed, either by Western Union or its contractor, after the raising of the manhole was completed, which appears to have been the adopted procedure throughout. On August 30, 1954, Western Union, as owner, and Carlson & Sons, as its contractor,

completed raising manhole No. 69. The next day, August 31, the contractor applied blacktop around manhole No. 69 in order to create a ramp around the manhole in its raised position. It appears that other owners raised manholes on this street both before and during August 30 and 31.

On September 17, 1954, at about 6:30 p.m. William A. McDonald operated his automobile in a southerly direction upon First Avenue North between 6th and 7th Streets North causing his car to strike manhole No. 69. The city had not yet resurfaced the street in that immediate area. Elizabeth McDonald was a passenger in her husband's automobile at the time of the collision.

The plaintiffs alleged that the collision with the manhole, which resulted in personal injuries to Elizabeth McDonald and damage to her husband's automobile, was the result of carelessness and negligence on the part of the defendants in failing to properly erect guards or barricades to warn and protect travelers on the street. Western Union cross-claimed against the city of Minneapolis; Carlson & Sons cross-claimed against Western Union and the city of Minneapolis; and the city of Minneapolis counterclaimed and cross-claimed against Western Union.

Plaintiffs' claims were tried before a jury, and the jury found in a special verdict that manhole No. 69, after its raising was completed, constituted a dangerous obstruction to automobile traffic; that plaintiff William A. McDonald's automobile collided with it; and that Western Union and Carlson & Sons were not negligent in failing to place barricades or warning devices at manhole No. 69 after having completed raising it. The jury found that the city of Minneapolis was negligent in not placing barricades or warning devices at manhole No. 69 after the raising of it had been completed; that the city's negligence was the proximate cause of the collision; that plaintiff William A. McDonald was not negligent in colliding with manhole No. 69; and that he had not assumed the risk of the damage. The jury found that the car damages amounted to $350 and that damages sustained by plaintiff Elizabeth McDonald amounted to $100 plus medical services and X-ray expenses in the sum of $50 and clothing damages in the sum of $14.95.

The trial court approved the special verdict of the jury with the ex-

ception of the medical services and X-rays for plaintiff Elizabeth McDonald in the sum of $50, which the court set aside due to failure of proof. The city of Minneapolis moved for judgment notwithstanding the verdict or in the alternative for a new trial and the trial court denied the motion and ordered judgment in plaintiffs' favor against the city in the amount of $498.68. The city appeals from that judgment and from another judgment wherein it was adjudged that defendant city recover nothing from defendant Western Union on the counterclaim and cross-claim filed by the city but that Western Union recover from the city the sum of $14 costs and disbursements.

The city of Minneapolis makes the following assignment of errors: That the court erred in denying its motions for a directed verdict made during the jury trial; that the court erred in permitting plaintiffs to reopen their case at the court's suggestion, after plaintiffs had rested and motions had already been made on behalf of the city of Minneapolis for a directed verdict upon the ground that there had been no showing of actual or constructive notice to the city, and in admitting into evidence as a part of plaintiffs' case certain portions of paragraph 5 of the cross-claim of the city of Minneapolis against Western Union after the court had suggested to plaintiffs that they proceed accordingly; that the court erred in refusing to give the city's requested instruction No. 5; and that it erred in sustaining an objection to evidence contained in an offer of proof of the city connected with its cross-claim against Western Union; that the court erred in denying the city's motion for judgment in its favor notwithstanding the special verdict or for a new trial; that the court erred in finding as fact that there were approximately 90 manholes on First Avenue North between 5th and 7th Streets and that the manholes of Western Union were raised on time schedules set by the city of Minneapolis; and that the court erred in finding as fact that after the manholes were raised the city took over control of First Avenue North; that the court erred in adopting findings of fact as found by the jury; that the court erred in its conclusions of law denying recovery to the city of Minneapolis from Western Union on its counterclaim and cross-claim and that Western Union recover from the city its costs and disbursements; that the court erred in denying the city's motion to set aside the answers of the jury to questions numbered

3 and 5 of the special verdict and to substitute yes for the correct answer, and to questions 4 and 6, and in denying the motion of the city that judgment be entered in its favor against Western Union and Carlson & Sons; and finally that the court erred in denying the city's motion for judgment against Western Union in its favor based upon its cross-claim against Western Union.

The record herein presents the following legal issues: (1) Whether the ordinances urged as controlling by the city placing upon persons who make obstructions in the city streets the duty to manage them and maintain proper guards and lights, placing upon such persons the primary responsibility for injuries resulting from such obstructions, and giving the city the right of indemnity against such persons or the common-law rule of indemnity on the part of the city against the persons creating such obstructions are applicable in the instant case; (2) whether the trial court exceeded its powers in suggesting that the plaintiffs' case be reopened and further evidence be introduced on the question of notice to the city; (3) whether the city of Minneapolis, as a matter of law, was free from negligence in its maintenance of the street where the manhole was located and plaintiffs collided with it; (4) whether the plaintiff William A. McDonald, as a matter of law, was either guilty of contributory negligence or assumed the risk of the collision and the resulting damages.

The trial court deferred action on the city's motion for judgment notwithstanding the verdict or for a new trial in order that the parties entitled to do so might offer further evidence on the city's claims against Western Union. The court, however, at the time concluded that the special verdict should stand insofar as it decided fact questions on the liability issues in favor of plaintiffs and against the city of Minneapolis, citing Mix v. City of Minneapolis, 219 Minn. 389, 18 N. W. (2d) 130; Fitzgerald v. Village of Bovey, 174 Minn. 450, 219 N. W. 774; Rasmusen v. City of Duluth, 133 Minn. 134, 157 N. W. 1088; Cunningham v. City of Thief River Falls, 84 Minn. 21, 86 N. W. 763, in support of its conclusion that the negligence of the city of Minneapolis and the contributory negligence of the plaintiffs were properly fact questions for the jury's determination. We think the court reached the proper conclusion in that respect.

The trial court took the view that it was without error in suggesting to plaintiffs' counsel that plaintiffs might reopen and offer in evidence parts of paragraph 5 of the city's cross-claim against Western Union in order to show the time lapse which gave notice to the city of the manhole situation. We think it within the discretion of the trial court to have done so in the interest of justice.

■ The city of Minneapolis made written request for the submission of the following instruction to the jury:

"Under Section 17 of Chapter 8 of the City Charter and under the ordinances of the City of Minneapolis, numbers 5:3 and 13:59, the Western Union Telegraph Company and Victor Carlson & Sons, Incorporated had the duty to use reasonable care in making repairs and raising of its own manhole, and if the manhole was a dangerous obstruction in the street after it was raised, said Western Union Telegraph Company and Victor Carlson & Sons, Incorporated had the duty to place barricades or lanterns or take other steps to warn the traveling public of the obstruction."

The city of Minneapolis contends that the court's failure to give this instruction constituted error.

In searching the record it appears that plaintiffs had not claimed that the city's codefendants were liable for violation of the charter and ordinance provisions cited therein and plaintiffs did not request that a similar instruction be given. The trial court instructed the jury that these codefendants would be liable for any negligence in failing to place barricades or warning devices at the manhole and defined the duties of the codefendants in that respect. We think that the charge as to negligence contained in the requested instruction was sufficiently given in substance and that neither the city of Minneapolis nor the plaintiffs were prejudiced.

The court indicated at the close of the trial that further testimony would be taken later upon the city's claims against Western Union and it reserved for itself the determination of ultimate liability presented by the various cross-claims between the city of Minneapolis and its codefendants. Such testimony was later taken and the court in its final findings included an order for judgment on the cross-claims. These conclusions were based upon the whole of those findings of fact which

included fact findings on the resurfacing program of the city of Minneapolis, the raising of the grade of the streets involved, and the raising of the manholes to the required level before grading and resurfacing. While the court ordered that the city of Minneapolis recover nothing from Western Union on its counterclaim and cross-claim, it did find that Western Union was entitled to recover from the city of Minneapolis its costs and disbursements.

■ It is clear from the court's memorandum made a part of its order that it reached the conclusion that the project which resulted in the collision and damages to the plaintiffs was the resurfacing program undertaken by the city of Minneapolis as the principal actor; that the city made the decision that the streetcar tracks should be buried under a 3-inch layer of blacktop to improve the street surface in order to expedite the movement of traffic and ease the problems of street maintenance. The city having reached this decision, all manholes had to be raised to conform to the proposed new street grade. The city requested that Western Union raise its own manholes and in doing so Western Union acted at the request and under the direction of the city. It is clear that the city determined at what specific times the manholes were to be raised and how much and that the raising of the Western Union manholes was not for the benefit of Western Union or other public utilities but for the benefit of the city. Manholes belonging to the city had to be treated in the same manner and were raised by a similar procedure. The raising of the manholes and the subsequent blacktopping continued over a period of at least three weeks. The requested raising of manholes done by Western Union was of short duration. It was likewise in response to and in strict accordance to times and exact specifications requested by the city through its engineering department. It was carried out under the direct supervision of the foremen of the city of Minneapolis who represented the city engineer's office and others who contributed their part to the overall job. The record supports the finding of the court that after the work was completed on August 31, 1954, on manhole No. 69 the job was accepted by the city and immediately thereupon Western Union's contractor removed its equipment from the area. That area was at all times under the sole and exclusive control of the city of Minneapolis engineering

department from some date prior to August 31, 1954, to September 17, 1954, when the accident here involved occurred. Western Union contends that after the work was done on manhole No. 69 as requested there remained no further duty or obligation on its part to place or continue barriers or barricades around manhole No. 69, the city having accepted the completed work of raising the manhole and continuing as it had before in full control of the street. It might be observed here that 17 days had passed from the time that manhole No. 69 was raised and the work of raising completed before the accident occurred. Also that meanwhile the resurfacing had progressed at that point but the city had permitted traffic to go around the barricades which it had erected at the street intersections and to pass through on this street in order to relieve traffic congestion. The raising of manholes and the subsequent blacktopping was according to the record a continuing process over several weeks and during that period it would appear that the only way motorists could have been fully protected from the probability of colliding with the raised manholes was to barricade the streets entirely and prohibit the movement of any vehicular traffic in those areas. Western Union contends that the individual barricading of each manhole raised would have resulted in practically complete congestion of the movement of the traffic in the area involved.

The city's letter to Western Union indicates clearly that it wished to keep the streets open and impliedly told manhole owners to barricade only during the raising operations. Western Union contends, and with some justification, that the city assumed the responsibility of partially protecting the two-block area here involved by erecting barricades at the street intersections so as to slow down and divert all but necessary traffic. We think the city of Minneapolis on the whole dictated to Western Union that the city had assumed the responsibility of protecting the members of the public and that it therefore took that problem off the hands of its codefendants.

It must be assumed that the city concluded that it was not feasible to close First Avenue North to public travel; that to have done so would have created substantial traffic problems in the downtown area and imposed additionally a heavy burden in the direction of

traffic. It may well be inferred from the evidence that the city took the risk in deciding to permit motorists to move on the streets being resurfaced, having calculated that this would better serve the community than to close the streets. The situation therefore presents the question whether the city should bear the expense of any damages caused to motorists by this course of action. The trial court determined that the city had by the course taken obligated itself to bear the expense of any damages caused to motorists, providing such injured or damaged parties could establish proof of legal liability.

The city of Minneapolis relies upon certain ordinances contained in its city charter for its right to recover against Western Union for any liability legally imposed upon it by reason of motorists colliding with manhole No. 69. Minneapolis City Charter and Ordinances (Perm. ed.) c. 8, § 6, provides:

"The City Engineer, in addition to other duties, personally and by and through the assistants and employes under him in the Engineering Department of the City and under his direction, shall superintend and have general charge and control of all work of grading, and the laying and construction of sidewalks and crosswalks, and of all work ordered by the City Council to be done, in or upon the public streets, avenues, alleys and public grounds in the City of Minneapolis, including the installing and maintaining of street signs and traffic signs and signals therein, * * *; and shall see that all sidewalks and streets in the City which have been graded and opened for traffic are kept clear of obstructions and in such repair as to be safe and passable; * * *."

The trial court took the view that under this provision of the charter the city engineer was given the responsibility of keeping the streets clear of obstructions and keeping the street open or closed as necessary during the resurfacing program; that the raising of the manholes was only one of the steps involved in the general resurfacing program; that the city engineer had the responsibility of determining when the streets should be closed and what barricades should be erected during the resurfacing period; that Western Union would have been wrongfully interfering and creating improper obstructions if it had erected barricades around manhole No. 69 after it had been raised

and the work connected therewith completed; that the final decision as to barricading necessarily had to be left with the city engineer because he had the overall supervision of the entire program; and whatever barricading was decided upon had to be done on an overall basis and could not logically be left to the manhole owners who had simply been called upon to comply in a specific manner with certain requests from the city. The trial court therefore concluded that the jury had arrived at a common-sense conclusion when it decided that the city was the negligent party in failing to provide proper barricades and in deciding that Western Union and its contractor were free from negligence and should not be held responsible; and that the court could not transfer the liability established by the jury's verdict from the city to Western Union unless some charter or ordinance provision presented by the city would authorize that result.

The court in part based its conclusions on the decision reached by this court in Rengstorf v. Winston Brothers Co. 167 Minn. 290, 208 N. W. 995, in which case the defendant had contracted with the state to grade a highway. As a part of the highway defendant constructed a high embankment. The plaintiff's intestate was killed when one of the horses on his team stumbled and fell, dragging the wagon and its occupants down the embankment. In ruling the defendant contractor not liable this court said (167 Minn. 291, 293, 208 N. W. 996):

"Defendant had a contract with the state for the grading and nothing else. It was not thereby required to do any surfacing or erect any guard rails. The work was done under the supervision and inspection of the highway engineers. It was for them to say when the new road or any portion thereof should be opened for temporary or other use by the public. Defendant had nothing to say to that and under its contract could not have prevented the use of the fill by the public after its completion and before its final and formal acceptance. It stands proved if not conceded that defendant's contract had been completed to the entire satisfaction of the highway department some time before the accident but that it was not formally accepted until shortly afterwards. * * *

\* \* \* \* \*

"Certainly there was nothing to impose upon defendant the duty to

light the whole embankment. There was then no duty to light any part of it. Neither was there any duty to place guard rails along both sides and for its entire length. There was then no duty to rail it at any one point on either side. It was 40 feet wide and straight and no one point was more dangerous than another except as its height varied. To hold otherwise, we would have to say that a jury might properly place upon a grading contractor, *where the controlling authority of the state had subjected his completed work to public use, after* its satisfactory completion but before its formal acceptance, responsibility for failure to illuminate and equip it with guard rails. The result is impossible. The state itself, now the supreme authority as to trunk highways, does not light them. And in this case it withheld from defendant, in any event defendant never assumed, the duty of placing guard rails. That, we assume, was to be done later and by another contractor.

"* * * The job was finished before the accident. It was ready for formal acceptance which happened not to take place until just afterward. Defendant's work was not only completed but actually in use. *The state had taken possession.* That possession and the attendant use were not enhanced or otherwise changed by the mere form of final acceptance."[1] (Italics supplied.)

The question arises whether any city ordinances or charter provisions relied upon by the city of Minneapolis could affect or change the common-law result. The city of Minneapolis claims that Western Union should be held liable in indemnification to the city under the provisions of Minneapolis City Charter and Ordinances (Perm. ed.) c. 8, § 17, which reads:

"All persons who shall, by means of any excavations in or obstructions upon any street of said city, *not authorized by law* or the ordinances of said city, render such street unsafe for travel, or who shall *by negligence in the management of any such excavation or obstructions as shall be authorized,* or by failure to maintain proper guards or lights thereat, render such street insufficient or unsafe for travel, shall be liable for all damages not caused by the negligence of the party in-

---

[1] Other courts have made similar rulings. See, Annotation, 104 A. L. R. 955, 966.

jured, to whomsoever resulting, by reasons of such obstruction or negligence, and no action shall be maintained against said city for such damages unless such person or persons shall be joined as party defendants; and in case of judgment against the defendants in such action execution shall at first issue only against the defendant causing such insufficiency, and the city shall not be required to take steps to pay such judgment until such execution shall be returned unsatisfied, and if the city shall pay such judgment it shall become the owner of the same and may enforce payment of the same from the other defendant and shall be entitled to execution therein against him, and to take such other proceedings as judgment creditors are entitled to take." (Italics supplied.)

The trial court held that:

"This provision is not applicable here because: (1) this obstruction was *'authorized by law'* in that it was requested and required by the City Engineer (who was given control of the streets by the Charter provisions previously quoted) and (2) because the jury has found that Western Union was not negligent in the management of the obstruction.

"The City also relies upon Chapter 5:3, section 7, of the City Ordinances (Ackman & Newhall Permanent Compilation, page 834) which provides:

" 'All persons and companies accepting this ordinance and operating under it, assume all liability for any and all accidents, injuries and damages that may be caused to any person or property by putting in such underground wires, conduits or cables, or by the use of the same, and shall at all times save the City of Minneapolis harmless therefrom, and from all damages growing out thereof, and on ten (10) days' notice from the city shall appear and defend all suits against said city growing out of any such accident, injury or damage.' " (Italics supplied.)

The trial court held that this section is inapplicable because:

"* * * these damages were not caused by *'putting in such underground wires, conduits or cables, or by the use of the same'* but rather was caused by the action of the City in requiring that the manholes be

raised as a part of its resurfacing program." (Italics supplied.)

The other ordinance provision relied upon by the city is Minneapolis City Charter and Ordinances (Perm. ed.) 13:59-5, which reads:

"No person or persons shall make any excavation in any of the streets, avenues, lanes, alleys, highways or public grounds in said City, for any purpose, or remove the earth or soil therefrom, or make or cause to be made any obstruction of any kind therein, until he first shall be specially authorized to do so by permission of the City Engineer and two aldermen of the ward wherein such excavation or obstruction is sought to be made, which permission shall be in writing, or partly in writing and partly in print, and filed with the City Clerk, who shall thereupon furnish such person with a certified copy thereof; and no person when so authorized shall make any such excavation or obstruction until he shall erect a suitable guard or fence about the place of such excavation or obstruction, sufficient to protect persons or animals from being injured by falling into or upon the same, and every person making such excavation or obstruction shall place and maintain during the hours between sunset and sunrise a suitable number of red lights on all sides thereof to warn the general public of the existence of such excavation or obstruction, and shall, when the purposes of such excavation or obstruction are accomplished, or when so ordered by the City Engineer, without delay, fill up or remove the same so that it shall at least be in as good condition as at the time of the issuance of said permit."

The court held this section to be inapplicable because the obstruction here in effect was created by the city itself when it requested that Western Union raise the manhole; that no permit is required under this section when the city requests that work be done as a part of a city project; that Western Union maintained guards during the period when the manhole was being raised; and that after the raising was completed pursuant to the directions of the city Western Union could not remove the obstruction because the obstruction was to be removed by the city itself when it raised the street grade to the level of raised manhole No. 69 by applying blacktop. The city contends that by reason of the duties created and the conditions imposed by its ordinances

the present situation is governed by the rule that, where a statute or ordinance imposes upon a person a specific duty for the protection or benefit of others, and he neglects without justification or excuse to perform such duty, he is liable to those for whose protection or benefit it was imposed, for any injury of the character which the statute or ordinance was designed to prevent proximately caused by his neglect. If the disobedience of the statute results in injury to one for whose protection it was passed, liability follows and the violation of an ordinance has the same effect in this regard as the violation of a statute. 13 Dunnell, Dig. (3 ed.) § 6976(1).

The city cites Osborne v. McMasters, 40 Minn. 103, 41 N. W. 543, together with other cases upon which it relies, to support its contention that Western Union is obligated to indemnify the city to the same extent as if Western Union had been obligated by contract to indemnify the city. The city claims and cites cases in support of its contention that the city has in effect through its ordinances contracted for indemnity against damage resulting from its own negligence so as to become entitled to indemnification in the instant case from Western Union. After a careful consideration of the cases which the city cites in support of its contentions, we have come to the conclusion that the cases upon which it relies are all distinguishable upon the facts and are not controlling in the case at bar.

Western Union takes the position that the ordinances cited by the city as providing the right to indemnification do not have absolute application in any and all cases, but rather that such application must be limited or completely barred depending upon the circumstances surrounding the construction of the alleged obstruction; that the effect of those provisions must depend upon the source of the control, how that control is exercised, and in the instant case the purpose of and the manner in which the resurfacing program was carried out generally. While it may be true that the aforesaid ordinance provisions provide in essence that any party either with or without municipal approval that constructs an obstacle in the city's right-of-way shall be liable for damages caused by that obstruction, nevertheless, in this case whatever the raising of the manhole by Western Union amounted to in the way of an obstruction, it was not an obstruc-

tion raised for its benefit but wholly for the benefit of the public, the city streets, and the resurfacing program.

We do not think that the trial court erred in refusing to place these ordinances before the jury. There are no grounds upon which the city may justly complain of any failure on the part of the trial court to charge the jury concerning the effect of those ordinances since the city is primarily liable for any damages caused by the raised manholes as between the city and Western Union. This primary liability arises from the facts presented by the situation as a whole which clearly indicate that the city required that the manholes be raised as a part of its own program and that it actually took over control of the street after manhole No. 69 had been raised.

We have carefully considered the overall findings of fact and the conclusions of law reached by the court. We agree with the facts found and the legal conclusions reached by the trial court. When an action is tried by a court without a jury, its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly contrary to the evidence, and such rule applies whether the appeal is from a judgment or from an order granting or denying a new trial. Bolduc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660; Lipinski v. Lipinski, 227 Minn. 511, 35 N. W. (2d) 708. All other assignments of error not heretofore separately considered have been examined, and we find no prejudicial error.

Affirmed.