FLORENCE L. DORNACK AND ANOTHER v.
BARTON CONSTRUCTION COMPANY, INC.
MARIAN E. WADE AND ANOTHER v.
FLORENCE L. DORNACK AND OTHERS.

137 N. W. (2d) 536.

September 17, 1965—No. 39,630.

*O'Brien, Ehrick & Wolf, R. V. Ehrick,* and *Michael Berens,* for appellants.

*Mahoney & Mahoney* and *Richard P. Mahoney,* for respondent Barton Construction Company.

SHERAN, JUSTICE.

Appeal from an order of the district court denying the motion of Florence L. Dornack and Charles Dornack for judgment notwithstanding the verdict or a new trial.

At about noon on a bright, sunny day in October 1960, Florence Dornack, accompanied by Marian Wade, a front-seat passenger, was northbound from Stewartville to Rochester on U. S. Highway 63. She was driving her husband's car, apparently as a gratuitous bailee. The road was familiar to her. She had driven from Rochester to Stewartville earlier that day and had gone this way as often as once a week during the previous year.

Barton Construction Company, Inc., was changing the highway from a blacktop two-lane thoroughfare (hereafter called old 63) to a concrete-surfaced four-lane divided highway. As the construction work progressed, rerouting of traffic was necessary, the place and manner changing from time to time.

Two miles north of Stewartville, Highway 30 goes west at a right angle from Highway 63 forming a T-intersection, significant principally as a point of reference. The accident with which we are concerned happened about 1,500 feet north of it. To the north of the T-intersection construction was in progress. To the south of it signs had been located warning of the approaching construction zone and fixing the speed limit at 40 miles per hour.

A plat of the area was received in evidence as plaintiff's exhibit 4 without objection. Station numbers are used on it in the customary way with

each station fixed at a highway centerline point 100 feet from the next one. At the point where the centerline of Highway 30 extended intersects the centerline of old Highway 63, the station is numbered 843. Station 844 is 100 feet to the north and so on.

The plat shows the divided highway as constructed on the day of the accident. The westerly slab (hereafter called slab W) consists of two 12-foot lanes beginning at station 847 and extending generally north so far as now relevant. The easterly slab (hereafter called slab E) runs parallel and 75 feet to the east of it. Slab E starts at station 858. Note that slab W was in place for 1,100 feet beyond the southern extremity of slab E.

Except for a "crossover road" (which will be described in the next paragraph), the traveled surface of old 63 joined with slab W in such a way as to make a perfectly straight road with a traveled surface 24 feet in width, blacktopped from station 843 (and beyond to the south) to station 847, and merged smoothly at that point with slab W.

We come now to the feature of the roadway of special significance in understanding this case. While, as stated, old 63 merged in a direct line with slab W, it was tied into slab E by what we will call, for lack of a better term, a "crossover road." To visualize it, begin at station 844 plus 60, noting that the east lane of the traveled surface of old 63 (12 feet from centerline to east edge generally) begins to widen as one goes north from that point. The angle of deviation is about 10 degrees. At station 847 this east lane of old 63 has broadened to almost 38 feet. The west lane of old 63 remains constant at 12 feet. In pictures received in evidence so much of this surface as extends easterly of the normal travel-surface width of old 63 appears to have a texture somewhat different than that of the westerly 24 feet. But the grade is the same and the entire surface of old 63 including this "flare-out" as it extends from station 844 plus 60 to station 847 is uniform and one.

Beginning at station 847, the "crossover road" extends northeasterly (at an angle of about 20 degrees with respect to the east edge of slab W) separating from old 63 to form a distinct traveled surface about 24 feet in width. It meets slab E at station 858.

Describing the situation from the viewpoint of one traveling north on old 63 and determined to drive onto slab E, the likely route would have

been: Proceed in the regular east 12-foot lane of old 63 to station 844 plus 60; then angle to the right at about 10 degrees; follow the "flare-out" of this lane for about 240 feet to station 847; angle another 10 degrees to the right; follow the separated part of the crossover road for about 1,100 feet to station 858 where slab E begins.

*On the day of the accident certain barricades of the gate type had been placed on the highway somewhere between station 843 and station 845,* the exact position being reported differently by the witnesses.[1]

The gate barricades with which we are concerned were two in number. Each consisted of two vertical standards to which were attached four 10-inch horizontal boards. Both were white except that the top board of each gate had "ROAD CLOSED" on it in large printing and the second and fourth of the horizontal boards on each standard was diagonally striped in black. Attached to each of the gates was a warning sign with an arrow pointing west. The gates were approximately 5 feet high and 10 feet wide and were placed about 2 to 4 feet apart. On the top of each gate there was a highway department warning flag. Directly in front of the more westerly gate barricade was a small flasher standard topped with two amber-colored lights and imprinted with the word "CAUTION."

The precise spot where this accident occurred was at the point of juncture between the crossover road and slab E at station 858. There the south end of slab E was exposed by reason of an excavation of the blacktop crossover road 12 inches deep, as wide as the traveled surface, and about 20 feet from north to south. About 15 feet south of the south edge of the excavation and in the middle of the crossover road there was a

---

[1] The witness DeKing fixed the place where these barricades were located initially at about station 844. Later in his testimony, his recollection having been refreshed, he placed the barrier at station 843 plus 20. This last placement was corroborated by the witness Mertz. The witness Rohne placed the barricade originally at about station 844 plus 45 and later corrected his testimony to show the barricade at about station 845. If at station 845, the barricade would have been on the south edge of the east lane of old 63 as it broadened out between station 844 plus 60 and station 847. The width of the traveled surface of the roadway south of the centerline at station 845 was about 20 feet according to the plat.

standard about 2 feet wide and 18 inches high at the top of which was affixed a blinker light about 6 inches in diameter. There was nothing imprinted on the standard.

The collision which caused damage to the Dornack car and personal injuries to its occupants occurred when the front end of the car came in contact with the exposed end of slab E at station 858, the end of the slab constituting an immovable roadblock at that point rising perpendicularly to a height of about 12 inches from the base of the gravel-covered excavated area.

Mrs. Dornack had driven northerly on old 63 past the two gate barricades, as she was able to do, because of the manner in which they were positioned, without crossing the centerline of the blacktopped surface of the old highway. Turning slightly to her right, she followed the direction of the crossover road accelerating her speed to about 50 miles per hour as she approached the place where the accident happened. With respect to the gate barricades which have been described in detail, she testified:

"I saw what I heard since is called a gate, a black and white sign, and * * * to me it was completely off the road, and I ignored it. I didn't think it had a thing to do with the highway, because the highway looked uninterrupted."

Concerning the flasher located near the excavated place, she acknowledged:

"A. * * * I saw it about half a block before I got to that.

"Q. And your speed when you got to it was what?

"A. I would guess around fifty.

"Q. And when you saw this small barricade what did you do?

"A. I slowed up, wondered what it was there for, and then I immediately by that time saw this depression in the road.

* * * * *

"Q. And then you applied your brakes, is that correct?

"A. Yes.

"Q. And you skidded into the new construction?

"A.   Fell into this hole and hit it.

\*   \*   \*   \*   \*

"A.   \* \* \*  I thought when I fell in I would jump over it.

\*   \*   \*   \*   \*

"Q.   \* \* \*  [T]here was no reason why you couldn't have your full attention on where you were driving and what you were doing, is that correct?

"A.   Right."

Separate actions were started by Marian E. Wade and Willard L. Wade, her husband, against the Dornacks and Barton Construction Company for the personal injuries sustained by Mrs. Wade and the consequent medical expense and loss incurred by her husband. The Dornacks started separate actions against Barton to recover for the personal injuries sustained by her and the property damage to the Dornack car. In the actions instituted by the Wades, reciprocal crossclaims were made by Barton and by the Dornacks. The actions and claims were consolidated for trial, and a jury returned a special verdict assessing the damages incurred and finding that there was no negligence on the part of Barton but that Mrs. Dornack's negligence proximately caused the accident and resulting damage. These findings of the jury were confirmed by the trial judge who ordered that judgment be entered in favor of the Wades for their damages as assessed by the jury against the Dornacks only. The Dornacks then moved that the trial court amend its findings and conclusions confirmatory of the special verdict or in the alternative grant a new trial. The motion was denied and the Dornacks appeal. The record does not show any post-trial motion by the Wades and they do not appeal.

The issues for consideration are (a) whether certain instructions given by the trial court relating to the negligence of Mrs. Dornack were prejudicially erroneous, and (b) whether the instructions given by the trial court with respect to the duty of Barton were erroneous, and when coupled with a failure to give certain other instructions requested by the Dornacks justify or require a new trial.

■  We do not review the instructions relating to the question of Mrs. Dornack's negligence because in our opinion the jury's finding that her negligence proximately caused the accident was right as a matter of

law.[2] Although the gate barricades placed as described were intended to direct traffic to stay off the crossover road and slab E, we will assume for the purpose of analysis of her conduct that the direction as given was not clear and unequivocal. Even so, there were warnings sufficient to impress a reasonably alert driver that the area into which she was moving was one where construction hazards of some kind were to be anticipated.

Having traveled back and forth on Highway 63 weekly while construction was in progress, and from Rochester to Stewartville that same morning, Mrs. Dornack should have known of the general condition of the road. Proceeding from Stewartville on Highway 63 towards the T-intersection with Highway 30, she had passed a sign warning of the imminence of a construction area and three posted speed signs fixing the maximum speed limit at 40 miles per hour. At some point between stations 843 and 845 she passed the two gate barricades which have been described. Although it was possible for her to do so without crossing the centerline of old 63, her conclusion that the barricades didn't have "a thing to do with the highway" was not reasonable.

Considering, (a) the size of the two gates; (b) based, as they were, on a level even with the traveled surface; (c) capped with flags; (d) conspicuously marked "ROAD CLOSED," and (e) fronted by a separate standard marked "CAUTION," there was clear notice of trouble ahead.

But the record indicates that Mrs. Dornack's only reaction to this warning was to increase her speed to 50 miles per hour, 10 miles above the maximum posted speed limit. If she had paid proper attention to the sign which she passed, she would surely have been put on sharp alert when she saw the standard and attached flasher light then located just south of the excavation. The distance of one-half block which separated her from the flasher light when she saw it should have been sufficient to enable her to bring her car under adequate control to avoid the impending danger which it forewarned, even though the excavation was not clearly perceptible at that point. Her failure to do more than discontinue acceleration was not consistent, by any interpretation, with the conduct to be expected of a reasonably cautious motorist charged with the knowledge which must be imputed to her. Testimony to the effect that she laid

---

[2] See, Gordon v. Pappas, 227 Minn. 95, 34 N. W. (2d) 293.

down 85 feet of skid marks leading to the point of impact with the exposed end of slab E supports her claim that she did, indeed, apply her brakes in an effort to avoid the collision. The speed at which she was going under the circumstances and her failure to make proper observation in a dangerous area made this late attempt useless and, in our judgment, constitutes negligence on her part which was a proximate cause of this accident as a matter of law.[3]

■ If negligence on the part of Barton combined with that of Mrs. Dornack proximately to cause damage to the Dornack car and injury to the passenger, Barton could be held liable to the gratuitous bailor of the motor vehicle for his damage [4] and also to the Dornacks for contribution in the sums adjudged against them as defendants in the Wade actions.[5] Foreseeable negligence of another is not an insulating intervening cause.[6]

Barton knew or should have known of the manner in which the gate barricades had been placed on the highway. It can be assumed that it was familiar by way of contrast with the standards approved by the highway department portrayed in defendant's exhibit G supplementing § 1707 of the specifications binding on contractors such as Barton engaged in road construction for the Minnesota Department of Highways. The illustration of barricades to be used where a road is closed makes it clear that the recommended method of entirely shutting off traffic from a highway consists of blocking off the entire traveled surface of the roadway with a sufficient number of barricades to prevent passage on the adjacent traveled surface of the highway.[7] The recommended sign to be

---

[3] Compare Hanson v. Bailey, 249 Minn. 495, 83 N. W. (2d) 252, and Foster v. Herbison Const. Co. 263 Minn. 63, 115 N. W. (2d) 915; Olson v. Hector Const. Co. Inc. 216 Minn. 432, 13 N. W. (2d) 35; Mix v. City of Minneapolis, 219 Minn. 389, 18 N. W. (2d) 130; McDonald v. Western Union Telegraph Co. Inc. 250 Minn. 406, 84 N. W. (2d) 630.

[4] See, Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 10 N. W. (2d) 406, 147 A. L. R. 945.

[5] See, Hanson v. Bailey, 249 Minn. 495, 83 N. W. (2d) 252.

[6] See, Souden v. Johnson, 267 Minn. 151, 125 N. W. (2d) 742. Note, Annotation, 100 A. L. R. (2d) 944.

[7] Highway Patrolman DeKing testified with respect to pictures of the gate barricades which were introduced in evidence as follows:

used where restricted travel is allowed does not carry the label "ROAD CLOSED," as was used in this case, but is marked instead "Under Construction Drive Carefully."

There is direct testimony in the record indicating that Barton knew or had reason to know that some motorists, even though negligent, would pass the barricade as constructed and proceed on the crossover road towards the excavation. Mr. Daniel Imholte, Barton's foreman at the job site here involved, testified:

"Q.  * * * [The] creation of this hole was done by Barton Construction Company, is that correct?

"A.  Yes.

$$* \quad * \quad * \quad * \quad *$$

"Q.  And that hole had existed for a period of * * *?

"A.  * * * I'd say probably two weeks.

$$* \quad * \quad * \quad * \quad *$$

"Q.  And you were sufficiently aware of [the danger of motor vehicles using the crossover road] that you thought the blinker was necessary?

"A.  Yes."

In view of these facts, Barton's general duty under the circumstances was correctly stated by the trial judge when he instructed:

---

"Q.  You testified that the type of barricade signs exhibited by Plaintiffs' Exhibits 1, 3 and 7 are in common use throughout the state for construction projects, is that correct?

"A.  Yes.

"Q.  Now isn't it true, officer, that the usual location of such signs when they are used is in the center of the traveled roadway?

"A.  Yes.

"Q.  And it physically prevents the passage of a motor vehicle to the area beyond?

"A.  Yes.

"Q.  And this was not the case in Highways 30 and 63, south, is that correct? There was no physical prevention of motor vehicle traffic on the traveled portion of the road?

"A.  This was the traveled portion of the road.

"Q.  I mean as to the main traveled portion of the road?

"A.  Not the—no."

"It is the duty of a road construction company in lawful possession of a road construction zone, acting through its officers, agents or employees to take reasonably adequate precautions to insure the safety of the general public and to take such action which a reasonable man would believe to be effective to provide adequate warning and protection to the traveling public. Failure to do so constitutes negligence."

But Dornacks' specific theory at trial was that Barton's negligence was a proximate cause of the collision because it failed to barricade the crossover road at some place close to or north of station 847 and that the "protection to the traveling public" required, under the circumstances of this case, the placement of additional barricades south of the dangerous excavation.

In an apparent effort to bring this aspect of the case to the attention of the jury, the Dornacks requested the following instructions:

"(2) Under its contract with the State of Minnesota, defendant Barton Construction Company was obligated to furnish and erect barricades and to erect warning signs at each location where operations are in progress and at any other obstruction to traffic when necessary to provide adequate warning and protection for the traveling public.

"(3) If defendant Barton Construction Company ought reasonably to have anticipated that a motorist would enter the construction zone, then under its contract with the State of Minnesota, defendant Barton Construction Company was obligated to furnish and erect barricades and to erect warning signs at each location where operations are in progress and at any other obstruction to traffic when necessary to provide adequate warning and protection for the traveling public.

\* \* \* \* \*

"(5) The term 'barricade' means an obstruction or block to prevent passage and not merely a warning."

The standard of care owed by the Barton Construction Company to the traveling public is not fixed by the terms of its contract with the State of Minnesota. But the provisions in that contract are proper for jury consideration in determining whether the construction company complied with its general duty of due care as defined by the trial court in the

instructions given by it and set out above.[8] A copy of the Specifications for Highway Construction of the State of Minnesota Department of Highways was offered in evidence as plaintiff's exhibit 5. It is a book consisting of about 800 printed pages with the provisions relevant to this phase of the matter set out particularly at §§ 1706 to 1707.2.

Section 1706 is captioned "PUBLIC CONVENIENCE AND SAFETY." It imposes on the contractor the duty to conduct his operations and perform the work in such a manner as to ensure the least obstruction and interference to traffic and provides:

"The Contractor shall take adequate precautions to ensure the safety of the general public * * *."

Section 1707 is captioned "PROVISIONS FOR TRAFFIC." It begins:

"In all cases where construction work interferes with the normal use of the highway, provisions will be made to either divert through traffic or to afford it the restricted use of the highway."

Section 1707.1 is captioned "Diversion of Thru Traffic" and § 1707.2 is captioned "Restricted Use of Highway by Traffic," in line with situation categories noted in § 1707.

In §§ 1707.1 and 1707.2, certain responsibilities are assigned to the state and others to the contractor. That this assignment of responsibilities is not intended to relieve a contractor from his general duties of due care with respect to the public is forecast by the second paragraph of § 1707, which reads:

"The following provisions shall not in any way relieve the Contractor of any of his legal responsibilities or liabilities for the safety of the public."

Both § 1707.1, treating of situations where through traffic has been di-

---

[8] "* * * We think that, whatever the reasoning may be, the better rule, and that now followed by the weight of authority, is that such contract provisions should be admitted for the jury's consideration, together with all other evidence, in determining the question of defendant's negligence." Foster v. Herbison Const. Co. 263 Minn. 63, 69, 115 N. W. (2d) 915, 919. Note, also, Annotation, 104 A. L. R. 955.

verted, and § 1707.2, treating of situations where restricted use of the highway is specified, place upon the contractor the responsibility of erecting and maintaining barricades under some circumstances and distinguish that obligation from the duty imposed to erect warning signs. Section 1707.1 includes this paragraph:

"At the ends of each section of the work under construction, where the character or condition of the work creates a hazard to traffic and at all dangerous sections, by-passes and intersecting roads, the Contractor shall: (1) furnish watchmen and flagmen; (2) furnish, erect and maintain secondary and excluding barricades; and (3) erect warning signs; all as may be required to adequately warn the traffic and exclude it from the construction area. * * * In addition thereto, he shall erect such other warning and traffic control signs as the Engineer directs."

Section 1707.2, dealing with restricted use of the highway by traffic, contains a paragraph which reads:

"At each location where operations are in progress and at any other obstruction to traffic, the Contractor shall (1) furnish watchmen and flagmen; (2) furnish and erect barricades; and (3) erect warning signs, all as may be necessary to provide adequate warning and protection for the traveling public and his own forces. In addition thereto, he shall erect such other warning and traffic control signs as the Engineer directs."

The fact that the contract gives certain assignments to the state involving warning signs, traffic control signs, and barricades does not eliminate the responsibilities of the contractor for the safety of the general public, particularly in view of the provision quoted to the effect that the provisions of § 1707 "shall not in any way relieve the Contractor of any of his legal responsibilities or liabilities for the safety of the public."

The distinction between a barricade and a warning sign becomes evident from reading such cases as Crowley v. City of Raymond, 198 Wash. 432, 88 P. (2d) 858; American Water-Works Co. v. Dougherty, 37 Neb. 373, 55 N. W. 1051; Schawe v. Leyendecker (Tex. Civ. App.) 269 S. W. 864; and Flynn v. Egan, 12 La. App. 128, 124 So. 598. These decisions illustrate the difference by defining a barricade as not merely a warning but an actual impediment to travel completely closing a passage-

way. And, as applied to highway construction in Minnesota, the use in §§ 1707.1 and 1707.2 of one Arabic number with respect to barricades and another with respect to warning signs emphasizes that in the industry the words have a distinguishable and different meaning.

Minn. St. 160.16 gives the commissioner of highways the duty to include in construction contracts the requirement that the contractor place warning signs (subd. 1) and detour signs (subd. 2). Subd. 3 provides that the commissioner of highways "may also provide, by contract or otherwise, for the erection of barricades, fences or other obstructions so as to prevent traffic from entering any impassable section of road or a section closed to public travel." The word "barricade" as used in § 160.16 must have been intended to convey a different meaning than the words "warning sign." A barricade is to "prevent traffic from entering any impassable section of road" while a warning sign is to warn "the public that the road under construction or improvement is impassable." The contract specifications further support this reasoning by distinguishing between the state's duty to erect "a standard warning barricade" and the contractor's duty to "furnish and erect barricades." The use of the word "barricade" in series with "fences, or other obstructions," words which imply a physical blocking of travel, further characterizes the intended meaning of the word "barricade." See, State v. Suess, 236 Minn. 174, 52 N. W. (2d) 409. Minn. St. 160.27, subd. 5(13), making it unlawful to drive around a barricade, implies that the purpose of a barricade is to prevent traffic from passing over a portion of a highway closed to the traveling public.

Although the attention of the jury was called to the provisions of the contract obligating Barton to furnish and erect warning signs, no reference was made to Barton's contractual duty to furnish and erect barricades if necessary to provide adequate warning and protection for the traveling public at hazardous points constituting an obstruction to traffic. The instruction as given was:

"Under the contract with the State of Minnesota the defendant Barton Construction Company, Inc. was obligated to furnish and erect warning signs at each location where operations are in progress and at any other

obstruction to traffic when necessary to provide adequate warning and protection for the traveling public."

The instructions requested by defendants Dornack were short and to the point. Two of the five related to the duty of the Barton Construction Company to give reasonably adequate warning of construction hazards without reference to the contract. Two related specifically to Barton's duties imposed by the terms of the contract and made reference to the contractual obligation to "erect barricades." The fifth requested instruction reads:

"The term 'barricade' means an obstruction or block to prevent passage and not merely a warning."

These requests coupled with the record as a whole make it clear that it was defendant's intent to try its case on the theory that Barton's failure to provide barricades was a proximate cause of the accident.

A party is entitled to an instruction setting forth his theory of the case if there is evidence to support it and if it is in accordance with applicable law. Hammond v. Minneapolis St. Ry. Co. 257 Minn. 330, 101 N. W. (2d) 441.

Although the matter before us is not free from doubt, we are persuaded that the effect of the instructions given, as compared to the instructions requested, was to tell the jury that Barton could be held liable if there was an absence of warning signs, but not if it was the absence of adequate and properly located barricades which caused the accident.

In view of the clear provisions of the contract between the State of Minnesota and Barton, which has been set out previously, we cannot agree with the respondent's contention that the responsibility for the erection of barricades rested exclusively with the state as a matter of law.

In our opinion the excavation and resultant roadblock created by Barton constituted an obstruction to traffic within the meaning of § 1707.2 of the specifications. The jury should have been told that it was Barton's duty to furnish and erect at a suitable place the barricades necessary to provide adequate warning and protection for the traveling public if a contractor exercising reasonable care under the circumstances would have done so.

Part of the difficulty in determining the disposition to be made of the case comes from the fact that there was no pertinent exception to the charge given by the trial judge upon its completion. We do not believe that this should be fatal to appellants' claim, however, when their theory of the case was called to the attention of the trial court as clearly as it seems to have been by requested instructions submitted in writing prior to the time the charge was formulated. The claimed error was specifically assigned in the motion for a new trial. In the trial judge's memorandum the omission of reference to Barton's obligation to barricade is not treated as a verbal inadvertence. See, Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807.

Our conclusion is that the omission was of particular significance under the unusual facts of this case and that the interests of justice will be served by a retrial of one issue: Did negligence on the part of Barton, if any, concur with that of Mrs. Dornack so as to be a proximate cause of the collision?

■ Appellants also except to the following instruction:

"The defendant Barton Construction Company, Inc. on October 6, 1960, * * * was in possession of the road construction land area pursuant to a contract with the State of Minnesota, and any motorist entering upon that area were trespassers."

The instructions as given were based upon the decision of this court in Hanson v. Bailey, 249 Minn. 495, 499, 83 N. W. (2d) 252, 257. In that case the court said:

"* * * Defendant Morse was in possession of the road construction land area pursuant to a contract with the state, and any motorists entering upon that area were trespassers."

The preliminary question to have been answered in deciding whether Mrs. Dornack was trespassing on the section of road intended to be withdrawn from public use was this: Did the gate barricades as marked and placed constitute a clear and unequivocal direction to stay off? That question did not occur in Hanson v. Bailey, *supra*, because there the intent to bar traffic was so clearly manifested by the signs in place that all concerned were agreed as to the adequacy of the closure. In the present

case the gates were placed at least 12 feet east of the centerline of old 63 and at least 200 feet south of the place where the crossover road intended to be closed separated from old 63 and slab W. And if the signs had been placed near station 843 as the witness DeKing, his recollection refreshed, recalled it, it would have been possible, at least, to relate the arrow pointing due west under the printing "ROAD CLOSED" to Highway 30 which, were the gate barricades located as DeKing placed them, would be precisely in the direction the arrows were pointing.

If the signs in this case were adequate to convey to a user of the road clearly and unequivocally the intent of the highway department to close off the crossover road and slab E to all vehicular traffic, Mrs. Dornack was a trespasser; but not otherwise. Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807. If the signs were inadequate for the purpose, she was, as she drove on the crossover road, at a place where she had a right to be, subject however to the duty on her part to drive with that care and alertness to be expected of a driver forewarned of the existence of a construction zone and possible though unidentified hazards.

Paraphrasing the Wisconsin Supreme Court in Shawano County v. Froemming Bros. 186 Wis. 491, 498, 202 N. W. 186, 188: When Mrs. Dornack went by the barricades as she did, she was bound to know that it was a warning of possible danger ahead on the highway and it was her duty, for her own protection, in the exercise of reasonable and ordinary care, to ascertain what such danger was before proceeding, or, if proceeding, to so have her vehicle under control that dangers might be averted.

But she was not a trespasser in the absence of a finding that the barricades as constructed would have conveyed to a reasonable person in the position of Mrs. Dornack the intention that the section of the road, apparently usable, was closed to traffic.[9]

---

[9] Mr. Donald Cummings, postmaster at Spring Valley, was following Mrs. Dornack as she drove north toward the accident site. He also saw the gate barricade as placed and his testimony corroborates the inference that the direction to stay off the crossover road was ambiguous in some degree.

Mrs. Cummings, who was with her husband, testified that she had observed the accident area a week or two before the accident date and that it

Our view of the evidence would also make it advisable in the event of retrial to eliminate this questioned instruction:

"That an opening had been left and could be seen permitting passage through one side of the barrier can not be construed as an invitation to the general public to travel thereon in the face of the positive, absolute warning conveyed by the barrier itself with the sign thereon."

Such an instruction would be appropriate to a case where a barrier was so placed as to physically bar travel in a clear and unequivocal manner even though an ingenious driver might find a way around it. Such was the case in Fenske v. Kramp Const. Co. 207 Wis. 397, 241 N. W. 349. The instruction is not applicable to the case before us were the jury to find, as they might under the evidence, that the barrier as placed was so remote from the point of divergence of old 63 and the crossover road as to make its meaning less clear than it should have been and where, in the process of passing it, Mrs. Dornack could proceed northerly on old 63 in exactly the same way she would have done had the sign not been there.

■ A brief statement will serve to give our views on the remaining claims of error.

■ Conducting construction operations on a portion of a highway not intended to be open for public use was not a public nuisance within the meaning of Minn. St. 1961, §§ 616.01 and 616.02, even though done negligently. See, Nelson v. McKenzie-Hague Co. 192 Minn. 180, 256 N. W. 96, 97 A. L. R. 196.

■ Although Minn. St. 160.27, subd. 5(12), provides that it shall be unlawful to improperly place or fail to place warning signs and detour signs as provided by law, the section has no application where, as here, a road contractor may or may not be negligent for failing to place barricades depending on whether the jury finds that a reasonably prudent contractor would or would not have done so in light of the circumstances including the terms of his contract.

---

was then more clearly marked. Asked to explain, she answered: "This sign seemed to sit right directly in the path that you would know you wouldn't go through there." See, Annotations, 59 A. L. R. (2d) 1379 and 173 A. L. R. 626.

■ The instructions considered as a whole do not disparage the proper role of oral argument.

■ Barton is not negligent as a matter of law.

The case is remanded to the district court for a retrial of the single issue of whether negligence on the part of Barton concurred with the conduct of Mrs. Dornack—now established to have been a proximate cause of the accident as a matter of law—so as to be a proximate cause of the collision. If it was, and if we are correct in our assumption that Mr. Dornack was a gratuitous bailor of the damaged car, he is entitled to recover the property damage on his crossclaim and Barton will be responsible for contribution in the Wade cases. The amount of the verdicts returned in the favor of the Wades and the liability of the Dornacks to pay are unaffected by this decision.

The trial court is therefore affirmed as to all matters, except the issue specified, and the case is remanded to the district court for a new trial with respect to it.

Affirmed in part; reversed in part; and new trial on limited issue granted.