Carl W. CUMMINS, Jr., as Trustee for Next of Kin of Eloise E. Adams, Decedent, Respondent,

v.

Mary Jane RACHNER, et al., Respondents,

Timothy C. Flynn, Defendant,

Foley Brothers, Inc., Appellant.

Mary Jane RACHNER, et al., Respondents,

v.

FOLEY BROTHERS, INC., Appellant.

No. 46778.

Supreme Court of Minnesota.

Aug. 19, 1977.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and O. C. Adamson II, R. D. Blanchard and J. Richard Bland, Minneapolis, for appellant.

Cummins & Sheahan and Michael J. Sheahan, St. Paul, for Cummins.

Stringer, Donnelly, Courtney, Cowie & Rohleder and Owen L. Sorenson, St. Paul, Casimir L. Cyptar, St. Paul, for Rachner, et al.

Heard before PETERSON, TODD, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

Eloise E. Adams was a passenger in an automobile operated by Mary Jane Rachner. Mrs. Rachner was proceeding west on Highway No. 12, a divided highway, approaching the city of St. Paul. It was nighttime and snowing. She entered an area of highway construction being performed by Foley Brothers, Inc., (Foley) for the State of Minnesota. In a construction bypass area, Mrs. Rachner became confused by lane markings painted on the road surface and drove her vehicle over the median into the eastbound lane of traffic where it collided with a vehicle being driven by Timothy C. Flynn. Mrs. Adams died as a result of injuries suffered in the accident, and Mrs. Rachner suffered severe injuries. The jury found the state, Foley, and Mrs. Rachner negligent and awarded $225,000 in damages to the trustee of the next of kin of Mrs. Adams. Foley appealed. We affirm.

On the evening of November 15, 1973, Mrs. Rachner, accompanied by Mrs. Adams, drove to Afton, Minnesota, to attend a meeting. They left the meeting at approximately 10:30 p.m. and proceeded west on Highway No. 12 toward the city of St. Paul. By this time weather conditions were poor due to a combination of snow and rain that was described by Mrs. Rachner as moderate to heavy in quantity and intensity.

Upon entering St. Paul, Mrs. Rachner encountered an area of road construction designed to upgrade Highway No. 12 to interstate standards. The building of the highway was to be accomplished in stages, using bypasses, so that a four-lane divided highway would remain open to the public while the new freeway was under construction. The particular segment of highway construction in question was 1.8 miles in length and was being laid by Foley under a contract with the state.

In building the construction bypass, Foley connected segments of Highway No. 12 with newly constructed roadway. The bypass was completed and opened to the public on November 1, 1973, approximately 2 weeks prior to the accident. To delineate the driving surface on the bypass, the state painted new white lines on Highway No. 12 and the newly constructed portions of the bypass and at the same time applied a coat of black paint to obliterate the old traffic lane markings on Highway No. 12. These old traffic lines, if not effectively obliterated by the application of black paint, would direct an unsuspecting motorist in a straight line from the westbound portion of the bypass directly into the eastbound lane of traffic. The state also placed a barricade, which consisted of three crossmembers painted alternately with white and orange diagonal stripes, adjacent to the position where the old Highway No. 12 lane markings and the newly painted markings intersected. There were no overhead lights or flashing warning signals in the immediate area.

Mrs. Rachner testified that due to the severe weather conditions and poor visibility, she reduced the automobile's speed to approximately 30 to 40 miles an hour prior to entering the bypass. She also testified that upon entering the construction zone, she sought to maintain her vehicle's position on the roadway by traveling in the right lane of the westbound portion of the highway. Since there was no overhead lighting in the construction zone, Mrs. Rachner directed her attention to the solid white line which marked the northern edge of the highway and the broken white line which divided the two westbound lanes of traffic.

As the Rachner automobile entered the area in which the accident ultimately occurred, Mrs. Rachner observed the barricade erected by the state approximately 30 feet ahead. Upon seeing the barricade, she became startled and turned her vehicle to the left, apparently to avoid a collision with the barricade. Mrs. Rachner then felt something under the wheels of her car and has no memory of what occurred thereafter. However, she did testify that her automobile was traveling in the right-hand lane of the westbound segment of the construction bypass prior to the accident. This statement is consistent with the physical evidence presented in the case.

In fact, the Rachner vehicle proceeded from the westbound lane of traffic across a temporary median and collided with an automobile operated by Timothy Flynn traveling in the opposite direction. Malcom R. Lundgren, a state highway patrolman, was summoned to the scene of the accident and conducted an investigation. As part of his investigation, Officer Lundgren retraced the route traveled by the Rachner vehicle prior to the accident. When he entered the construction zone, Officer Lundgren immediately noticed that the old Highway No. 12 lane markings appeared "as bright and as white" as the new lane markings. Rather than indicating the correct route and direction of the temporary bypass, the old lane markings led over the median directly into the path of oncoming traffic traveling east on the bypass. Thus, despite the attempted obliteration of the old Highway No. 12 traffic lines through the application of a coat of black paint, the old markings remained quite visible.

As a result of the accident Mrs. Rachner suffered numerous injuries requiring extensive hospitalization, and Mrs. Adams died from her injuries. Mrs. Rachner and her husband, Donald E. Rachner, commenced an action against Foley to recover damages for the injuries she sustained in the collision. Carl Cummins, Jr., as trustee for the next of kin of Mrs. Adams, brought an action against the Rachners, Foley, and Flynn for Mrs. Adams' wrongful death from the same mishap. The two actions were consolidated for purposes of trial.

At the close of plaintiffs' case, Flynn's motion for a directed verdict was granted. The case was submitted to the jury on a special verdict by which the jury determined that the accident was caused by the combined negligence of Mrs. Rachner (20-percent negligent), Foley (40-percent negligent), and a nonparty, the State of Minne-

sota[1] (40-percent negligent). The jury awarded the trustee for Mrs. Adams $225,000 in damages.

The following issues are presented for consideration on appeal:

(1) Whether the trial court erred in denying Foley's motion for a mistrial because of an alleged prejudicial statement made by a juror in the presence of other prospective jurors.

(2) Whether Foley, road construction contractor of the bypass and the new interstate highway, is liable for any inadequacy of the traffic lane markings appearing within the construction zone.

(3) Whether the damage award for the wrongful death of Mrs. Adams is excessive.

1. During the course of jury selection in the trial, the court asked each of the prospective jurors whether they were familiar with the section of highway where the accident occurred. In response to the inquiry, one juror stated that he was familiar with the roadway and considered it a "trap." Foley's counsel then moved for a mistrial, which was denied by the trial court. After more thought concerning the court's inquiry, the prospective juror stated that he had had another area in mind when he originally answered the question and therefore believed he could be a fair and impartial juror. Without challenging this juror for cause or exercising a preemptory challenge to remove the juror from the panel, Foley's counsel renewed the motion for a mistrial, which again was denied.

On appeal, Foley argues that the trial court erred in not granting its motion for a mistrial. Foley contends that since the juror's initial statement was made in the presence of the other prospective jurors, the entire jury panel was "contaminated" thereby, making a fair trial impossible. This contention is without merit. A prospective juror need not be ignorant of the facts and issues, but rather must be able to

lay aside his impressions and opinions to enable the jury to render a fair and impartial verdict. *State v. Andrews,* 282 Minn. 386, 394, 165 N.W.2d 528, 534 (1969). This is precisely what the prospective juror assured the court that he would do. His first answer to the inquiry concerning the scene of the accident did not contaminate the remainder of the jury panel because the juror later stated that the area which he believed to be dangerous was not where the accident actually occurred.

The denial of a mistrial is a matter of discretion for the trial court and absent an abuse of discretion its decision will not be overturned on appeal. See, *Goblirsch v. Western Land Roller Co.,* Minn., 246 N.W.2d 687 (1976). Foley's contention that the trial court erred in denying its motion for a mistrial is diminished further by the fact that it failed to challenge this juror either for cause or through the use of a preemptory challenge. Thus, the trial court did not abuse its discretion and commit reversible error by denying Foley's motion for a mistrial.

2. Foley also argues that it cannot be liable for an automobile accident caused by the inadequacy of the traffic control markings appearing on the bypass. Foley premised this argument upon a statutory provision[2] which places the primary responsibility upon the state to provide traffic control devices and markings on its roadways and highways. Thus, Foley argues that since the state, rather than a private road contractor, has a duty to obliterate the old lane markings and delineate the new traffic lanes, it could not be liable in this case for an accident allegedly caused by a failure to obliterate the old Highway No. 12 lane markings.

This argument is not supported by the evidence in this case or by our case law. The construction contract entered into between the state and Foley incorporated by reference the manual entitled Minnesota

1. Although the State of Minnesota was not a defendant, the issue of whether it was negligent in this case was nevertheless submitted to the jury by the court.

2. See, Minn. St. 169.06, subd. 2.

Standard Specifications for Highway Construction, dated January 1, 1972. Several provisions included in the specifications manual state that the private contractor does have a responsibility to provide for the safety of the general public in the construction zone. Section 1404 provides:

"Unless otherwise provided, the road while undergoing improvement shall be kept open to all traffic, at the expense of and by the Contractor. Bypass facilities shall be provided by the Contractor as necessary to accommodate traffic, even though the Plans may not provide for their construction as Contract Items. * * *

 *   *   *   *   *   *

"*The Contractor shall keep those portions of the Project being used by public traffic, whether it be for local traffic only or for both local and thru traffic, in a condition that will permit the traffic to move safely under its own power regardless of weather conditions   *. * * .*" (Italics supplied.)

Section 1707 further provides:

"The Contractor shall at all times conduct his operations and perform the work in a manner that will assure the least possible obstruction to traffic, and *he shall provide for the safety of the general public as well as the residents abutting the highway.*" (Italics supplied.)

In addition to these contractual provisions, several recent decisions of this court hold that a private contractor, when entering into a road construction contract with the state, assumes a general duty to protect the public from hazards or traps within the construction zone. In *Dornack v. Barton Construction Co., Inc.,* 272 Minn. 307, 319, 137 N.W.2d 536, 545 (1965), we stated:

"The fact that the contract gives certain assignments to the state involving warning signs, traffic control signs, and barricades does not eliminate the responsibilities of the contractor for the safety of the general public."

Further, in *Smith v. Lafortune,* 288 Minn. 135, 141, 179 N.W.2d 136, 140 (1970), we held that the state and the private road contractor possess a mutual duty to protect the motoring public from dangerous conditions in the construction zone:

" * * * Whatever may have been the rule prior to that decision [*Dornack v. Barton Construction Co., Inc.,* 272 Minn. 307, 137 N.W.2d 536], we there made clear the duty of contractors to protect the public from snares, traps, and pitfalls by erecting appropriate warning signs while contracting or repairing public highways. This obligation, more fully specified in contracts governing highway construction, frequently coincides with a mutual duty shared by the state to provide unwary motorists." Cf. *Ferguson v. Benson,* Minn., 244 N.W.2d 116, 120 (1976).

Thus, it is readily apparent that in this state we have established a mutual duty upon both the state and its highway contractor to protect the general public from dangerous conditions which are present within the construction zone.

Mr. Jeri R. Oman, construction site superintendent for Foley, stated that it was his responsibility to conduct the construction work in a manner that would provide for the safety of the workers as well as the general public. Oman admitted that, while he did not regard the state's painting job as inadequate, he could still plainly see the old lane lines even after the attempted obliteration thereof by the state. Even though Mr. Oman knew that the old lines were visible and realized this could create a dangerous situation, he did not inform the state of their existence. He also testified that Foley employed a safety engineer on this construction job whose duties included assuring that the segments of the highway within the construction site would be completely safe for the general public. Although the safety engineer did not testify, Mr. Oman stated that according to his knowledge, the engineer did not notify the state of its failure to completely obliterate the old lane lines.

Thus, we hold that Foley as a private road construction contractor possessed a mutual duty with the state to protect the

general public from dangerous conditions within the construction zone. In the present case, Foley failed to notify the state of the obvious danger created by the inadequate obliteration of the Highway No. 12 lane markings which appeared on the construction bypass. Foley also did not erect any signs to warn motorists of the condition when it had an obligation to do so under its contract. By failing to warn or protect the public from a known danger, Foley breached the mutual duty shared with the state and was justifiably determined by the jury to be liable for any damages resulting therefrom.

In addition, Foley argues that since the construction of the bypass had been completed at the time of the accident, the state had assumed control of that segment of the construction site terminating Foley's duty to protect the public from any hazards within the completed area. This argument is also without merit because the completion of the construction bypass did not terminate Foley's work on the project or its duty to protect the general public from hazards in the construction zone. See, *Smith v. Lafortune,* 288 Minn. 135, 179 N.W.2d 136 (1970).

■ Foley also contends that the trial court erred in allowing the jury to take the specifications manual with it during the deliberation on the case. We have previously addressed a similar issue and stated that the admissibility of the specifications manual at trial is largely discretionary with the trial court. See, *Poppenhagen v. Sornsin Construction Co.,* 300 Minn. 73, 220 N.W.2d 281 (1974). In the present case the trial court did not abuse its discretion in allowing the jury to refer to the specifications manual during its deliberation.

Finally, Foley takes exception to the trial court's instruction to the jury concerning the duties of a private road construction contractor to the general public. A review of the jury instruction in its entirety demonstrates that the issue was fairly and properly presented to the jury.

■ 3. Both Mrs. Rachner and Foley contend that the award of $225,000 to the trustee of the next of kin of Mrs. Adams was excessive. The amount of damages recoverable for the wrongful death of another is to be determined by the "pecuniary loss resulting from such death." Minn. St. 573.02, subd. 1. Although damage awards should have an adequate factual basis and should not be the product of passion or prejudice, the jury is not bound by any fixed or precise mathematical rules in reaching an amount. 2 Speiser, Recovery for Wrongful Death 2d, § 9.2. In *Fussner v. Andert,* 261 Minn. 347, 354, 113 N.W.2d 355, 359 (1961), in discussing the measure of damages for wrongful death, we stated:

> "Moreover, it should be acknowledged that the death-by-wrongful-act statute is remedial in character and it is the court's duty to construe it liberally in light of current social conditions. * * *

> \* \* \* \* \* \*

> "We have often said that the measure of damages is the money value to the survivor of the continuance of decedent's life, measured by the money value of what the evidence shows the decedent probably or with reasonable certainty would have contributed in money, property, or services during the remainder of his life. Yet in case after case we have approved verdicts in amounts which have apparently exceeded the measure permitted by the strict pecuniary-loss rule. It may also be said that courts have been loath to scrutinize verdicts closely in an attempt to break them down to determine the actual money loss established. This is not only because such verdicts are by the very nature of the action speculative, but also because of the emotional factors involved, allowance is made for elements of loss which are not within the limits of recovery set by the rule."

In reviewing Foley's contention that the damage award is excessive, we must consider the contributions Mrs. Adams made to her family. Mrs. Adams was a truly remarkable and exceptional woman. She was 37 years old at the time of her death with a life expectancy of 39.8 more years and had

been married to James Adams for 19 years. Mr. Adams was 41 years old at the time of her death with a life expectancy of 28.5 more years. The couple had seven children who ranged in age from 4 to 20 at the time of death. The Adams' 5-year-old child was born prematurely and as a result has a learning disability. Mrs. Adams had worked during the earlier years of the marriage. She was active in church affairs and arranged for the children's attendance at church and Sunday school. She was an excellent housekeeper, made clothes for the children, managed the family budget, and directed the care and maintenance of the family home. Mrs. Adams even reupholstered furniture in order to assist the family's financial situation. She counseled the children in their day-to-day activities, assisted them in their homework, and devoted additional time to the child with a learning problem in order to help him in overcoming his disabilities. Mrs. Adams rose to a position of prominence in the community as a cofounder of the Oxford playground, as an active member of the League of Women Voters, and by being appointed by the Ramsey County District Court to the St. Paul City Charter Commission. Despite this active and demanding schedule, Mrs. Adams was also attending Concordia College in the evening and had completed 2 years of college at the time of her death.

■ Thus, the pecuniary loss to the family in this case must be measured against the achievements of the deceased and her daily contributions to the Adams family. The court properly instructed the jury that in determining the pecuniary loss, it should consider the deceased's contributions in the past; her life expectancy at the time of her death; her health, age, habits, talents, and success; her occupation, her personal living expenses, her legal obligation to support the Adams' children, and the likelihood of fulfilling that obligation if it were necessary; the counsel and guidance she would have given Mr. Adams; and the advice, comfort, assistance, and protection which she would have given the children if she had lived.

■ The trustee presented expert testimony concerning the market value of some of these items. The expert limited his testimony to those specific items which could be replaced in the market such as housekeeping services. Defendants argue that his testimony was improper because he did not reduce his figures to current market value. However, we do not regard this fact as error since the trial court did instruct the jury that any award must be reduced to its current market value and that as jurors it was their responsibility to determine the weight to be given such expert testimony.

■ Considering the amount of the damage award in light of the rather extraordinary facts presented in this case, it may be characterized as liberal but certainly not as excessive. Defendant Foley presents in its brief a chart showing an annual withdrawal from the fund of $20,000 and assumes an investment rate of 6 percent. The figures indicate that at the end of 12 years there still would be $95,095 remaining in the fund. However, a completion of this chart shows that the fund would be exhausted within 18 years. At that time, the youngest child would be 22 years old, the oldest child would be 38, and Mr. Adams would still have a life expectancy in excess of 10 years. Further analysis of Foley's projection shows that Mr. Adams would presumably receive one-third of the annual fund with the remaining two-thirds divided among the seven children. Pursuant to this plan, Mr. Adams would receive approximately $550 per month, and each child would receive about $195 per month.[3] Additionally, if the trustee's plan is adopted and $30,000 is withdrawn annually from the fund, the total award of damages would be exhausted in 10 years rather than 18 years as under Foley's projections. Viewed from this perspective, we cannot say that the damage award is excessive.

Affirmed.

3. These figures make no allowance for funeral expenses or other expenses incurred by the family as a result of Mrs. Adams' death.