E. Lester ZINNEL, Trustee for the Heirs of Patricia L. Zinnel, Deceased, et al., Appellants,

v.

BERGHUIS CONSTRUCTION COMPANY, et al., Respondents.

No. 48220.

Supreme Court of Minnesota.

Jan. 12, 1979.

Miller, Neary & Zins and John M. Miller, Minneapolis, for appellants.

Jardine, Logan & O'Brien and Graham Heikes and Charles E. Gillin, St. Paul, for respondents.

Heard before SHERAN, C. J., and ROGOSHESKE, PETERSON, YETKA, and WAHL, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Plaintiff E. Lester Zinnel and his family were involved in a two-automobile collision on a bypass of a highway under construction by defendants Berghuis Construction Company and Minnesota Valley Improvement Company near Madelia, Minnesota, on January 2, 1973. Plaintiff and his two children were injured, and his wife died as a result of the collision.[1] Third-party defendant, Albert M. Teigum, driver of the second automobile, also died as a result of the collision. Plaintiff alleged negligence by defendants in the signing, striping, and barricading of the highway construction project.[2]

The trial court granted defendants' motion for a directed verdict on the ground that there was not sufficient evidence to find that the alleged negligence of defend-

---

1. The singular reference to plaintiff here incorporates his own claim for personal injuries, his status as guardian for the personal injury claims of his children, and his position as trustee for the wrongful death claims of the heirs of his deceased wife.

2. The third-party complaint against Albert M. Teigum was dismissed by agreement between the parties. Teigum's estate paid $180,000 to plaintiff and plaintiff's counsel stipulated at trial that plaintiff was only seeking to recover for that percentage of negligence attributable to defendant contractors.

ants proximately caused the accident.[3] We affirm.

The construction contract between the state of Minnesota and defendants Berghuis Construction Company and Minnesota Valley Improvement Company entered into on April 1, 1971, involved the extension of a four-lane concrete expressway from a short distance west of Lake Crystal to approximately 1 mile east of Madelia. A new two-lane roadway was to be built just south of existing Highway No. 60 and was to be used to carry eastbound traffic from Madelia to Lake Crystal. Existing Highway No. 60 was to be repaired after the new facility was completed and, after repair, was to be used for all westbound traffic between Lake Crystal and Madelia. When the new facility was completed, work was to be commenced on the old facility. At that time, all traffic was to be switched from the old facility to the new facility. The new facility was to have two-way traffic until the old facility was completed. Temporary blacktop connections between the two facilities were to be constructed at each end of the project in order to route traffic from the old facility to the new facility.

The new facility was completed on June 23, 1972. The temporary connection at the west end of the project was completed the week ending July 2, 1972. The state highway department signed, striped, and barricaded the new facility and temporary connection on August 3 and 4, 1972. On August 7, 1972, the new facility and its temporary connections were opened for both eastbound and westbound traffic. The project was put into an authorized winter suspension on November 7, 1972, and defendants left the jobsite.

The collision between the Zinnel and Teigum vehicles occurred on January 2, 1973, at about 2:45 p. m., near the east end of the temporary connection outside of Madelia. It was a clear, sunny winter day. The Teigum vehicle was apparently proceeding east to west, heading into Madelia, and the Zinnel vehicle was coming out of Madelia, proceeding west to east. The head-on collision of the two automobiles occurred in the Zinnel vehicle's lane. An accident reconstruction expert testified for plaintiff that the Teigum vehicle would have traveled onto the blacktop connection via the eastbound lane if the Zinnel vehicle had not been there.

There is minimal evidence as to how the accident happened. There were no eyewitnesses to the accident, and Teigum died at the scene. Plaintiff did not remember anything about the accident except "something red." (The Teigum vehicle was maroon.) He did not recall whether the "something red" was in his lane. Plaintiff's son, Jeffrey, was in the front passenger seat and only remembered looking up and seeing a "red flash."

The layout and markings of the highway require brief description as they relate to plaintiff's claim of causal negligence. The collision occurred at the east end of the temporary connection which was in the shape of a gentle "S" curve from west to east, a distance of 1,000 feet. At each end of the temporary connection there were two 400-foot, 2-degree curves which were connected by a straightaway tangent of 200 feet. Approaching the scene of the accident from the direction traveled by the Teigum vehicle, a driver would have first seen a 65-mile-per-hour speed limit sign, and then he would have seen a curve sign with a combination yellow advisory 50-mile-per-hour speed limit marking. This curve sign was located approximately 700 feet east of the accident and 620 feet from the

---

**3.** In granting defendants' motion for a directed verdict, the trial judge relied on three independent grounds: (1) Defendants were under no duty to erect or maintain the traffic control devices in place at the time of the accident; (2) the winter suspension relieved defendants of any duty to erect or maintain traffic control devices; and (3) there was insufficient evidence that negligence in regard to these traffic control devices proximately caused the accident. In denying plaintiff's motion for a new trial, the trial judge relied on this third ground of lack of proximate cause and did not expressly base his decision on the first or second grounds. In view of our disposition of the proximate causation issue, we need not consider the other grounds of the trial judge's order.

curve. The next sign was a 50-mile-per-hour maximum speed sign located about 500 feet from the accident and 420 feet from the curve. The new concrete pavement continued past the temporary connection and dead ended. At this point two barricades were placed in each lane of traffic, and on the northernmost barricade there was an arrow pointing toward the direction of the temporary connection. On the new concrete pavement there were dashed yellow centerlines which continued past the temporary connection to the barricades. Just prior to where the temporary connection began, a double, solid yellow do-not-pass line was painted on the concrete facility extending in a curve to the right through the temporary connection. This formed the left-hand side of the lane the driver was to use. Additionally, a solid white edge line was painted on the concrete facility extending in a curve through the temporary connection; this edge line formed the right-hand side of the lane the driver was to use.

The evidence of negligence itself was in dispute. Plaintiff's traffic engineering expert testified that based on his personal experience the signing, striping, and barricading were inadequate. He also testified that in his opinion these existing conditions were well below the acceptable minimum shown in the *Manual on Uniform Traffic Control Devices*, a document put out by the United States Department of Transportation, which he testified represented the state of the art in highway engineering. Defendants' expert witnesses testified that the traffic control devices were adequate. Likewise, traffic flow records demonstrated that during 1972 an average of 4,080 vehicles per day traveled on this highway near the east side of Madelia, and the chief dispatcher for the county testified that her records revealed no other accidents at this area.

The crucial issue was whether plaintiff introduced sufficient evidence that any inadequacies in these traffic control devices proximately caused the collision. Photographs admitted into evidence demonstrated that there were no obstructions to a driver's view of the curve. It was uncontroverted that at the time of the accident the day was sunny, and the road was dry. Because there were no eyewitnesses and occupants in the Zinnel vehicle recalled seeing only "something red," it was not known what each vehicle was doing before impact. There was no testimony indicating either plaintiff or Teigum was ever confused or misled by these traffic control devices. Teigum was familiar with this road. Because he had a daily routine of driving into Madelia to pick up a newspaper, Teigum traveled on this temporary connection nearly every day during mid-to-late afternoon from August 7, 1972, to the date of the accident. Therefore, a reasonable inference was that Teigum knew about the upcoming curve and understood he was to follow the double centerlines and not the dashed centerlines which extended into the barricades.

A motion for a directed verdict presents a question of law regarding the sufficiency of the evidence to present a fact question for the jury to decide. *Jacoboski v. Prax*, 290 Minn. 218, 187 N.W.2d 125 (1971). The motion should be granted in those unequivocal cases where in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence. *J. N. Sullivan & Assoc. v. F. D. Chapman Const. Co.*, 304 Minn. 334, 231 N.W.2d 87 (1975). The motion for directed verdict admits for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence. Nevertheless, "* * * a court should direct a verdict in favor of the party in whose favor the evidence overwhelmingly preponderates even though there is some evidence in favor of the adverse party. Not every conflict in the evidence gives rise to a jury question." 304 Minn. 336, 231 N.W.2d 89.

Plaintiff claims Teigum strayed into his lane either because he was not given sufficient advance warning of the curve or because he was misled by the continuation of the dashed centerline. Plain-

tiff has the burden of proving defendants were guilty of negligent conduct and that such negligence was the proximate cause of the accident. While circumstantial evidence can provide sufficient proof of causal connection,[4] such proof must be something more than merely consistent with plaintiff's theory of the case. As we expressed it in *E. H. Renner & Sons, Inc. v. Primus*, 295 Minn. 240, 243, 203 N.W.2d 832, 835 (1973):

"Where the entire evidence sustains, with equal justification, two or more inconsistent inferences so that one inference does not reasonably preponderate over the others, the complainant has not sustained the burden of proof on the proposition which alone would entitle him to recover. It becomes the duty of the trial court to direct a verdict because failing to do so would cause any verdict to the contrary to be based on pure speculation and conjecture."

We agree with the trial court that an examination of the evidence shows that plaintiff's theory is no more supported by or consonant with the facts than other theories which could be developed, theories which would relieve defendants of liability. Plaintiff's theory as to the cause of this accident is no more consistent with the facts than a theory which speculates Teigum was inattentive, took the curve in too wide a fashion, failed to keep his vehicle under control, swerved to avoid something on the road, misjudged the situation, or did anything else to establish he was solely negligent and the sole direct cause of the accident. There is not a sufficient factual basis for concluding traffic control devices proximately caused this accident.

From the evidence as a whole, it would be conjecture for a jury to find inadequate traffic control devices proximately caused this accident. Therefore, the trial court properly granted defendants' motion for a directed verdict.[5]

The present case is distinguishable from our decision in *Smith v. Lafortune*, 288 Minn. 135, 179 N.W.2d 136 (1970); *Larson v. Township of New Haven*, 282 Minn. 447, 165 N.W.2d 543 (1969); *Dornack v. Barton Const. Co.*, 272 Minn. 307, 137 N.W.2d 536 (1965); *Majerus v. Guelsow*, 262 Minn. 1, 113 N.W.2d 450 (1962); and *Cummins v. Rachner*, 257 N.W.2d 808 (Minn.1977). There was positive testimony that traffic control devices proximately caused the accidents in *Lafortune*,[6] in *Dornack*,[7] and in *Cummins*.[8] In *Larson*, the plaintiff's posi-

4. *Majerus v. Guelsow*, 262 Minn. 1, 7, 113 N.W.2d 450, 455 (1962).

5. The signing, striping, and barricading of the new facility and temporary connection were under the jurisdiction and supervision of the state highway department and its officials. Therefore, one of defendants' theories in support of the directed verdict is that they owed no duty to plaintiff to erect or maintain these traffic control devices. On the question of whether highway contractors owe a duty to travelers regarding traffic control devices erected by the state, defendants argue our decisions in *Smith v. Lafortune*, 288 Minn. 135, 179 N.W.2d 136 (1970), and *Dornack v. Barton Const. Co.*, 272 Minn. 307, 137 N.W.2d 536 (1965), were decided under language contained in the 1959 Standard Specifications for Highway Construction, language different from that contained in the 1968 Standard Specifications for Highway Construction at issue in this case or involved in our decision in *Cummins v. Rachner*, 257 N.W.2d 808 (Minn.1977). It is arguable that the change in language from the 1959 standard specifications which occurred in the 1968 standard specifications was not addressed by this court in the *Cummins* case. We do not express an opinion as to whether the state and a highway contractor could by contract safeguard the contractor from the duties of care regarding traffic control devices owed to the traveling public, other than by creating a right to indemnity.

6. While it is not clear from our opinion in *Smith v. Lafortune, supra*, an examination of the transcript in that case demonstrates there was evidence the driver followed and relied on the white centerlines up to the time the collision with the other vehicle took place, though the driver had amnesia as to the exact details of the accident's occurrence.

7. In *Dornack v. Barton Const. Co., supra*, the driver testified that she saw the barricades, but she ignored them because she could continue to drive on the road and therefore believed the barricades did not pertain to that road.

8. In *Cummins v. Rachner, supra*, the driver of the vehicle in which plaintiff's decedent was killed testified that she was following the painted lines immediately prior to the accident.

tion was fortified by the presumption of due care on the part of the decedent conferred by Minn.St.1976, § 602.04,[9] a statutory presumption which did not operate in the present case. Likewise, the accident in *Larson* took place at night and the circumstances indicated the decedent was not familiar with the road and that the road and its surrounding terrain gave no indication where the road ended. While our opinion by a divided court in *Majerus* is conceptually similar to the present situation, there are significant differences between the two cases.[10]

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.

---

**9.** Minn.St.1976, § 602.04, provided: "In any action to recover damages for negligently causing the death of a person, it shall be presumed that any person whose death resulted from the occurrence giving rise to the action was, at the time of the commission of the alleged negligent act or acts, in the exercise of due care for his own safety. The jury shall be instructed of the existence of such presumption, and shall determine whether the presumption is rebutted by the evidence in the action." This statute was repealed by L.1978, c. 491, § 1, and L.1978, c. 674, § 46.

**10.** In *Majerus v. Guelsow, supra,* we noted none of the other possible inferences as to the cause of death created as reasonable an inference as that reached by the jury. In the present action, plaintiff's theory is no more reasonable than many other theories which could be developed. Also, it is likely the plaintiff in *Majerus* was aided by the presumption of due care provided in Minn.St.1976, § 602.04.