# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

JENNIFER B. DONNELLY, as guardian )
for MARSHALL S. DONNELLY; )
JENNIFER B. DONNELLY; KEITH )
KESSLER as Guardian ad Litem for )
LINLEY GRACE DONNELLY, a minor )
child, )
      )
      Appellants, )
      )
      v. )
      )
HDR ARCHITECTURE, INC., TURNER )
CONSTRUCTION COMPANY, a )
foreign corporation, NOISE CONTROL )
OF WASHINGTON, INC., a Washington )
corporation; JANE AND JOHN DOES )
1-20, )
      )
      Respondents. )
_____)

No. 72824-5-I

UNPUBLISHED OPINION

FILED: August 8, 2016

VERELLEN, C.J. — A tort claim for negligence arising out of a construction project may support the admission of evidence of the contract provisions governing the project and argument about what the contract required parties to do. But breach of contract itself is not part of the negligence breach of duty calculus.

Marshall Donnelly, an electrician at the Washington State Penitentiary,[1] was injured when a suspended metal security ceiling he walked on collapsed. He sued the

---

[1] Jennifer Donnelly, as her husband Marshall Donnelly's guardian, and Keith Kessler, as the Donnellys' minor child's guardian ad litem, brought the action. They are collectively referred to as "Donnelly." The Washington State Penitentiary and Department of Corrections are collectively referred to as "the Department."

architect, general contractor, and subcontractor on the design/build project that included the installation of the ceiling. He relied on the defendants' contractual obligation to provide an operations and maintenance manual including any information related to product warranties at the project closeout. Donnelly's negligence theory is that the defendants knew but did not advise the Department that walking on the ceiling would void all warranties.

Donnelly focuses on an instruction directing that the jury "may not consider whether the contract was breached in considering whether the defendants were negligent."[2] Because breach of contract itself was not before the jury, the instruction did not misstate the law. And such an instruction does not warrant any relief on appeal, especially because the instructions in their entirety allowed Donnelly to adequately argue his negligence theory.

Donnelly's other claims also fail. We affirm.

## FACTS

### A. THE NORTH CLOSE PROJECT

In 2004, the Department sought to expand its Walla Walla prison facilities in the North Close Project. The Department chose a design-build procurement and delivery method. HDR Architecture, Inc., the architect, and Turner Construction Company, the contractor, formed a joint venture and successfully bid on the project. The Department's specifications set forth in detail the layouts, materials, square footages, and products for the buildings' design and construction.

---

[2] Clerk's Papers (CP) at 8905.

2

For purposes of this appeal, it is undisputed that the HDR/Turner joint venture designed and built the North Close Project according to the Department's specifications.

### B. THE SUSPENDED METAL SECURITY CEILINGS

The North Close Project's design incorporated mandatory security features. Designated Security Level B areas in particular were designed and constructed with a suspended metal ceiling that hung below a concrete lid that formed the floor of the next higher level. Suspended metal security ceilings had never previously been used at the prison.

HDR selected Lockdown as the suspended metal security ceiling product for Security Level B areas. The Lockdown ceiling is a panel system similar to acoustical tile ceilings found in many offices. It consists of a two-foot by two-foot pattern grid suspended by steel wires hung from the roof deck above the grid and into which the two-foot by two-foot panels fit. It is intended to resist the efforts of someone trying to gain access from below.

The Lockdown ceiling allows access to the plenum, the space containing plumbing, electrical, and other systems between the suspended ceiling and the concrete hard deck above, through removable access panels near fixtures in the plenum requiring regular access. Access panels were installed in locations the Department specifically selected. Access to other parts of the plenum requires disassembling a portion of the ceiling.

HDR selected a different type of suspended metal security ceiling product, Celline, for other areas. Both ceilings were approved by the Department.

None of the Department's specifications and requirements for the North Close Project provided that the prison ceilings should be walkable.

### C. CONSTRUCTION AND THE MAY 2006 LETTER

HDR/Turner began construction on the North Close Project in 2005 and substantially completed it in March 2008. The Department accepted the project on completion.[3]

In early 2006, more than six months before the first metal security ceilings were installed, a subcontractor asked Turner about the sequencing of its work: whether installation of the infrastructural systems in the plenum had to occur before installation of the Celline ceiling system or whether its tradespersons could wait until after installation of the Celline ceiling and then walk on the ceiling to install the systems. Turner asked Noise Control of Washington, Inc., the independent subcontractor responsible for installing the ceiling. In a May 2006 letter, Noise Control told Turner it had asked the ceiling manufacturer, Environmental Interiors, who had responded that walking on the ceiling would "void all warranties."[4]

The May 2006 letter was not provided to the Department.

### D. O&M MANUAL

HDR/Turner was contractually required to give to the Department an operations and maintenance manual (O&M Manual) at the completion of the project. An O&M Manual typically contains manufacturer-provided information on the numerous

---

[3] The trial court ruled HDR met the standard of care and was not negligent in its design of the North Close Project. See CP at 4793-96. Donnelly has not appealed that ruling.

[4] Ex. 38; CP at 236-37.

materials, products, and systems featured in a project. The O&M Manual here included materials that subcontractors had supplied to Turner as required by their subcontracts and primarily consisted of product information for the products the subcontractors installed. The O&M Manual also included contact information for the various North Close Project suppliers and contractors.

For the metal security ceilings, Noise Control sent Turner the metal security ceiling brochures it had received from Environmental Interiors to include in the O&M Manual. Those brochures contained warranty information, but did not contain any information about whether the ceilings were walkable.

The O&M Manual that Turner delivered to the Department made no mention of the May 2006 letter or that walking on the ceilings would impact warranties.

### E. THE ACCIDENT

Roughly 18 months after the North Close Project was completed and the Department had put the buildings into service, Donnelly and his fellow journeyman electrician Justin Griffith were assigned to install conduit throughout the Unit South building. According to Griffith, he and Donnelly had previously walked on metal ceilings for other jobs and considered the job routine.

On December 29, 2009, Donnelly climbed a ladder, opened an access panel to the Lockdown ceiling, and climbed into the plenum. Shortly after, the ceiling collapsed and Donnelly fell to the concrete floor 10 feet below, suffering serious permanent injuries.

## F. DONNELLY'S LAWSUIT

Donnelly sued HDR, Turner, Noise Control, and Environmental Interiors for negligent design and construction and for failure to warn or to train prison staff about the metal security ceiling.[5] Donnelly's primary theory was that the defendants were obligated to include the May 2006 letter at the project's closeout because the project's specifications required any information that could affect a product warranty to be included in the O&M Manual. Donnelly alleged Turner's failure to do so was negligent and a proximate cause of his injuries.

A unanimous jury found none of the defendants negligent. The trial court denied Donnelly's motion for a new trial.

Donnelly appeals.

## ANALYSIS

### I. JURY INSTRUCTION 14

#### a. NO MISSTATEMENT OF THE LAW

Donnelly's primary argument is that Instruction 14 misstates the law and thus is presumptively prejudicial.[6]

Whether a jury instruction reflects an accurate statement of law is reviewed de novo.[7] Jury instructions are reviewed in their entirety and are sufficient if they allow counsel to argue their theory of the case, are not misleading, and when read as a whole

---

[5] Environmental Interiors settled before trial.

[6] Contrary to the respondents' argument that Donnelly acquiesced to Instruction 14, Donnelly submitted briefing objecting to the instruction before any oral argument on the issue and further objected to the instruction on the record. See CP at 8787-8811; Report of Proceedings (RP) (Oct. 8, 2014) at 2768-2814, 2850-57, 2913-18.

[7] Joyce v. Dep't of Corrs., 155 Wn.2d 306, 323, 119 P.3d 825 (2005).

properly inform the jury of the applicable law.[8] "If any of these elements are absent, the instruction is erroneous."[9] But an erroneous instruction is reversible only if it prejudices a party.[10] "Prejudice is presumed if the instruction contains a clear misstatement of law; prejudice must be demonstrated if the instruction is merely misleading."[11]

Instruction 14 stated:

> You have heard testimony about the language in the contract relating to maintenance and warranty information. You are instructed that there are no breach of contract claims against the defendants in this case, and you may not consider whether the contract was breached in considering whether the defendants were negligent. This evidence may be considered on the issue of causation.[12]

Donnelly relies heavily on Davis v. Baugh Industrial Contractors, Inc.[13] There, a crew foreman of a concrete company was killed after a wall collapsed on him in an excavated hole.[14] The foreman had entered the hole to try to pinpoint a leak in a pipe that had been installed by a contractor three years earlier during a construction project.[15] That contractor defended the negligence suit on the ground that the common law completion and acceptance doctrine shielded it from liability for negligent work after the work was completed and accepted by the property owner.[16] The trial court granted

---

[8] Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996); Caldwell v. Washington State Dep't of Transp., 123 Wn. App. 693, 697, 96 P.3d 407 (2004).

[9] Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012).

[10] Id.

[11] Id.

[12] CP at 8905.

[13] 159 Wn.2d 413, 150 P.3d 545 (2007).

[14] Id. at 415-16.

[15] Id. at 416.

[16] Id.

summary judgment in favor of the contractor, but our Supreme Court reversed. The Davis court abandoned the "ancient" completion and acceptance doctrine and instead adopted the *Restatement* approach, holding that "a builder or construction contractor is liable for injury or damage to a third person as a result of negligent work, even after completion and acceptance of that work, when it was reasonably foreseeable a third person would be injured due to that negligence."[17]

Donnelly asserts the negligent work referred to in Davis encompasses more than just negligence in the design and physical construction of improvements to real property. According to Donnelly,

> the issue here, as in Davis, concerns "negligent work" in the course of the North Close Project. The "work" to be performed is spelled out in the Contract documents.
>
> HDR/Turner's "work" on [the] North Close Project under Davis included . . . (b) providing information to the WSP about the building in the OMM[18] which specifically included an affirmative duty that HDR/Turner provide copies of warranties for [the] metal security ceiling, and (c) "lists of circumstances and conditions that would affect the validity" of those ceiling warranties.[19]

In analyzing why it was appropriate to abandon the completion and acceptance doctrine, the Davis court discussed how the doctrine had previously been justified based on the property owner's assumed responsibility for any defects in the work that remained after inspection and acceptance.[20] The court reasoned that, while the traditional rationale for the doctrine "may have been well founded in the mists of

---

[17] Id. at 417 (citing RESTATEMENT (SECOND) OF TORTS, §§ 385, 394, 396 (1965)).

[18] Donnelly's reference to the O&M Manual.

[19] Appellant's Br. at 27-28 (citation omitted).

[20] Davis, 159 Wn.2d at 419-20.

history," it was scientifically outdated and no longer appropriate in the modern era of complex, new construction materials and processes:

> Today . . . [w]iring, plumbing, and other mechanical components are increasingly concealed in conduits or buried under the earth. In short, construction has become highly scientific and complex. Landowners increasingly hire contractors for their expertise and *a nonexpert landowner is often incapable of recognizing substandard performance.*[21]

The Davis court further reasoned, "By insulating contractors from liability, the completion and acceptance doctrine increases the public's exposure to injuries caused by *negligent design and construction* of improvements to real property and undermines the deterrent effect of tort law."[22]

The Davis court's focus was on negligent work relating to latent construction defects and hazards that property owners would not be able to identify. The decision is restricted to the physical limitations on a landowner's ability to meaningfully inspect modern-day constructed facilities.

Contrary to Donnelly's assertions, the Davis court's reference to "work" was not so expansive as to include each and every aspect of a contractor's duties under its contract with an owner. An alleged failure to fulfill an administrative contractual obligation to include warranty information in an O&M Manual is not negligent work under Davis as though akin to a latent physical defect.

Donnelly attempts to combine the impact of Davis with the duty a contractor owes to third parties on a construction site during construction set forth in Kelley v. Howard S. Wright Construction Co.[23] Donnelly's reliance on Kelley is also misplaced.

---

[21] Id. at 419 (emphasis added).

[22] Id. at 419-20 (emphasis added).

[23] 90 Wn.2d 323, 582 P.2d 500 (1978).

In Kelley, an employee of a subcontractor hired by a general contractor was injured on a job site.[24] A jury found the general contractor at fault for the subcontractor's employee's injury.[25] The Kelley court held that a general contractor who has control over a work site owes a duty to third parties, including employees of independent subcontractors.[26] The Kelley court based the third-party duty a contractor owes to others on the construction site on three principles: (1) the common law duty a contractor owes due to its ability to exercise control over the work; (2) the statutory nondelegable duty to provide "a safe place of work"; and (3) a responsibility assumed under contract "for initiating, maintaining and supervising all safety precautions and programs in connection with the work."[27]

The Kelley court's three-pronged bases for imposing a duty on contractors to protect third parties at the construction site implicates a single rationale: the contractor's unique control over the site *during* construction. In Davis, however, the court imposed third-party liability *post*-completion and acceptance by rejecting an outdated defense that could no longer be justified because of modern-day technological innovation. Because there is no connection between the two cases, Donnelly's argument fails.

Donnelly relies on authority that the terms and provisions of the contract are admissible in a negligence claim grounded in a contract setting.[28] He thus contends

---

[24] Id. at 325.

[25] Id.

[26] Id. at 330-31.

[27] Id. at 330-333, 334.

[28] See Donatelli v. D.R. Strong Consulting Eng'rs, Inc., 179 Wn.2d 84, 93, 312 P.3d 620 (2013); Caulfield v. Kitsap County, 108 Wn. App. 242, 257, 29 P.3d 738 (2001); Larson v. Heintz Constr. Co., 219 Or. 25, 53-54, 345 P.2d 835 (1959); Wells v.

that in a negligence case grounded in contract provisions, one is entitled to argue breach of contract; not merely that the contract provisions apply and the defendant failed to comply with the provisions, but that the breach of the contract was a violation of the applicable negligence standard of ordinary care causing foreseeable injury to a third party.[29] Donnelly, however, provides no authority that one may argue breach of contract in a negligence tort case.

In this setting "breach of contract" is a term of art implicating the standards and nuances that would apply to a breach of contract claim. Instructing the jury that they could consider breach of contract would require further instructions clarifying how breach of contract concepts would apply to this setting. And because there was no testimony or other evidence framed in terms of breach of contract here, there is no concern that Instruction 14 precluded jurors from considering any specific evidence that had been presented to the jury.

Further, we consider Instruction 14 in the context of all the jury instructions. Here, the trial court gave Instruction 7, which unequivocally explained Donnelly's theory that because the project's specifications set forth a requirement that any information that could affect a product warranty be included in the O&M Manual, the defendants should have included the May 2006 letter about voiding the warranties:

> (1) The plaintiffs claim that defendants HDR and Turner were negligent in one or more of the following respects:
>
> . . . .

---

Tanner Bros. Contracting Co., 103 Ariz. 217, 222, 439 P.2d 489 (1968); Dornack v. Barton Constr. Co., 272 Minn. 307, 317, 137 N.W.2d 536 (1965).

[29] See Reply Br. at 1, 14-17.

       b. For failing to include the letter of May 23, 2006, or a list of *circumstances and conditions that would affect the validity of the warranties*, in the Operation and Maintenance Manual.

. . . .

(2) The plaintiffs claim that defendant Noise Control was negligent in one or more of the following respects:

. . . .

       b. For failing to include the letter of May 23, 2006, or a list of *circumstances and conditions that would affect the validity of the warranties*, in the Operation and Maintenance Manual.[30]

The trial court, borrowing language from <u>Davis</u>, also gave Instruction 10, which was based on Donnelly's proposed instruction:

A defendant is liable for negligent acts or failures to act in its work on this Project at the WSP if it was reasonably foreseeable that a third person would be injured as a result of that negligence.

It is not necessary that the sequence of events or the particular resultant injury or event be foreseeable. It is only necessary that the resultant injury or event fall within the general field of danger which the defendant should reasonably have anticipated.

The acceptance of the completed Project by the State of Washington is not a defense.[31]

The trial court further instructed the jury on the duty of care in Instruction 12:

Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.[32]

---

[30] CP at 8897 (emphasis added).

[31] <u>Id.</u> at 8901.

[32] <u>Id.</u> at 8903.

When read as a whole, the jury instructions properly informed the jury of the applicable law.

Donnelly focuses on the final sentence in Instruction 14: "This evidence may be considered on the issue of causation."[33] "This evidence" is a reference to the first sentence in the instruction regarding testimony about the contract language. Donnelly asks us to read an "only" into the final sentence, that the jury could "only" consider contract language for causation, but provides no authority supporting this view.

We conclude Instruction 14 is consistent with Davis and therefore, is not a misstatement of the law.

### b. ALLOWED DONNELLY TO ARGUE HIS THEORY OF THE CASE

Donnelly also argues Instruction 14 prevented him from arguing his theory of the case. We disagree. The trial court told Donnelly he could "certainly argue to the jury . . . that the May 23rd letter ought to have been included."[34] The court further told him, "You can put the standards up there and talk about this is what they were supposed to do under the contract, but you can't argue that that—the breach provides a basis for determining liability."[35] And in closing argument, Donnelly did exactly what the court told him he could do; put up the contract and argue what the defendants were supposed to do under the contract.[36]

Donnelly contends his references to the contract during closing were in the context of causation. Some were, but others clearly were not. For example, as to

---

[33] Id. at 8905.

[34] RP (Oct. 8, 2014) at 2803.

[35] Id. at 2917.

[36] See RP (Oct. 9, 2014) at 2995-96.

Noise Control's alleged failure to include the May 2006 letter in the O&M Manual, Donnelly argued, "[R]emember, *under their subcontract* with HDR/Turner, they're the first people responsible for providing in the manual, and he doesn't include the letter, either."[37] Additionally, in anticipation of a reference by the defense in closing that the project's specifications were different than the final construction documents, Donnelly generally argued, "Let's take a look and see what is actually in the construction documents[,]" referring to page 2810 of defense Exhibit 240, the final construction documents, which, under subheading "V," repeated verbatim what was stated in the project specifications under the same subheading.[38]

Donnelly made other numerous mentions of the contract language and the defendants' alleged failure to provide the information required in the O&M Manual. For instance, he argued:

> Now, we also have *the contract*, look at . . . Exhibit 44, page six. This has been up a lot . . . .
>
> It says, "*The OMM include* copies of warranties and bonds, *and lists of circumstances and conditions that would affect the validity of warranties or bonds.*"
>
> *Every single witness admitted that the May 23rd, '06 letter includes information about a circumstance or condition that would affect the validity of the warranty.* It says, "If you walk on the ceiling, you void the warranty." Okay. *So it should have been part of it.*
>
> Now, again, not a contract case, but this is another way that shows that the cause, the cause of this disaster, is the failure of HDR/Turner to put this information in the OMM.[39]

---

[37] Id. at 2985 (emphasis added).

[38] See id. at 3028.

[39] Id. at 2995-96 (emphasis added).

During rebuttal closing argument, Donnelly continued:

> You put [the letter] in [the OMM] for a reason, because you expect then the owner is going to see it and then won't do it. That's why they put it in there.
>
> The only way around it is to blame Mr. Howerton, and they ignore the fact that the easy thing to do is when you get the letter, *the reasonably careful contractor should just be sending it to the State right then.* I mean, why didn't they do that? It makes no sense.
>
> . . . .
>
> And then absolutely in the OMM, this is a cause. Another cause of this disaster is the—another opportunity, in fact, an absolute thing. *They should have sent it in. Reasonable care, you send that thing in with that OMM.*
>
> I mean, *Exhibit 38*, [the May 23, 2006 letter] they are not denying, they have given up trying to claim that it says anything different than what it is. It sets forth a clear *circumstance or condition that would affect the validity of the warranty* on the metal security ceilings. "Don't walk on them or you void the warranty." Can't get much clearer than that.[40]

Even the references made in the context of causation necessarily and clearly presented to the jury the broader theory of what the contract required.

And Donnelly's other miscellaneous references, while not expressly referring to the "contract," repeated the exact contract language—"circumstances and conditions"—that had been presented through several witnesses and exhibits, with argument about evidence of the defendants' failure to provide the May 2006 letter:

> This is what we say the evidence shows Turner and HDR did was wrong. It's pretty straightforward. You've heard this now for four weeks. Failing to inform, train, or warn the State that these metal security ceilings are not designed to hold the weight of a worker, and, if you walk on them, you void the warranties *in failing to include that information, either the letter of May 23, or a list of circumstances and conditions that would affect the validity of the warranties in the operations and maintenance manual.*[41]

---

[40] Id. at 3117-18 (emphasis added).

[41] Id. at 2971 (emphasis added).

Mr. McMillin testified that the letter of May 23, 2006, should have been included in the operations and maintenance manual. It should have been provided to the State. He admits it. . . . .

. . . . At least the *list of conditions* that would void the warranty.[42]

Nothing in the instructions as a whole told the jury they could not consider the contract language as a factor in determining negligence. Indeed, Instruction 1 told the jury "In order to decide whether any party's claim has been proved, you must consider all of the evidence I've admitted that relates to that claim."[43] We presume the jury followed the trial court's instructions.[44] Again, reading Instruction 14 together with Instructions 7, 10, and 12, the instructions allowed Donnelly to adequately argue his theory of the case.

Donnelly relies on the presumptive prejudice for an instruction that incorrectly states the law. He offers no alternative argument that Instruction 14, if misleading, caused actual prejudice.[45] Because he devotes no argument to establishing actual prejudice, we need not explore any potential alternative argument that Instruction 14 is misleading.[46]

Because Instruction 14 allowed Donnelly to argue his theory of the case, was not misleading, and properly informed the jury of the applicable law, it was sufficient.

---

[42] Id. at 2974-75.

[43] Id. at 2950; CP at 8889.

[44] State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

[45] Anfinson, 174 Wn.2d at 860.

[46] Fergen v. Sestero, 182 Wn.2d 794, 803, 346 P.3d 708 (2015) (the party challenging the instruction bears the burden of establishing prejudice).

## II. DONNELLY'S MITIGATING INSTRUCTION

Donnelly also appeals the trial court's refusal to give his mitigating instruction that would have told the jury it "may consider the language of the contract on the issues of causation *and as evidence of the standards and specifications that applied to the defendants.*"[47]

"Whether to give a particular instruction to the jury is a matter within the discretion of the trial court."[48] Thus, the "refusal to give a requested instruction is reviewed only for abuse of discretion."[49]

Donnelly argues his mitigating instruction "would have at least allowed plaintiffs in closing argument to connect the Contract language" to whether a reasonable contractor would have included the May 2006 letter in the O&M Manual.[50] But as discussed, not only was Donnelly able to adequately make this connection in his closing argument, he in fact did so. Therefore, although the court could have allowed the instruction, we conclude it was not an abuse of discretion to decline to do so.

## III. SPECIAL VERDICT FORM

Donnelly next contends listing HDR and Turner separately, rather than as a joint venture, on the special verdict form was error.[51] His argument is unpersuasive.

---

[47] CP at 8877 (emphasis added).

[48] Stiley v. Block, 130 Wn.2d 486, 498, 925 P.2d 194 (1996).

[49] Id.

[50] Appellant's Br. at 36-37.

[51] Donnelly also complains the trial judge's decision to separately list HDR and Turner on the special verdict form reversed an earlier summary judgment ruling entered by a different trial judge. But an interlocutory trial court order can be changed any time before entry of final judgment. Snyder v. State, 19 Wn. App. 631, 636, 577 P.2d 160 (1978) ("The court's final say on the merits is subject to revision at any time before final judgment.").

Donnelly was required to show one or the other or both members of the joint venture had been negligent. The court clearly recognized this standard. On the special verdict form, the first question asked whether any of the listed defendants were negligent with the specific direction "If you answered 'no' as to all defendants, do not answer any further questions, sign this verdict form and notify the bailiff. If you answered 'yes' as to any defendant, answer Question 2."[52] Therefore, Donnelly makes no showing that separately listing HDR and Turner on the special verdict form had any impact on the jury.

## IV. ADMONISHMENT BEFORE JURY

Donnelly argues the trial court erred by admonishing his counsel during closing argument, mistakenly instructing the jury that counsel had violated an agreement to give 24-hours' notice of the use of trial transcripts in closing argument.

The record reveals Donnelly had initially moved to preclude use of any trial transcripts during closing argument.[53] At a September 8, 2014 pretrial hearing, Donnelly stated such a prohibition would be unnecessary if he knew beforehand transcripts would be used.[54] The defense suggested requiring 24 hours' notice of which transcripts would be used, but Donnelly objected to the limited notice period. The following colloquy then took place:

> [Defense]: As far as it goes, we [are] just thinking, you know, not wanting to ambush someone at the last minute. . . . But we're fine with some kinds of advanced notice to make sure that there's no prejudice to either party about the . . . specific use of transcripts in closing. . . .

---

[52] CP at 8885.

[53] See id. at 5709-10.

[54] RP (Sept. 8, 2014) at 238 ("If transcripts are going to be used in closing, I just need to know.").

18

[Donnelly]:    Are we using transcripts or not[?]  If we are, fine.[55]

The court ultimately denied Donnelly's motion, but told the parties if they wanted to

agree not to use transcripts during closing, they could.[56]

One month later, Donnelly presented portions of trial testimony from multiple

witnesses in closing argument.  During a morning recess in the middle of Donnelly's

closing argument, defense counsel argued Donnelly had violated an order in limine or

an agreement to provide 24 hours' notice of the use of transcripts in closing.  Donnelly

argues the trial court "had about 60 seconds" to review the six pages of transcript from

the September 8, 2014 hearing.[57]  When the jury came in, the court advised them:

> Ladies and gentlemen, you should know that the lawyers had an informal
> agreement that they would let the other side know before they showed
> transcripts to the jury.  Mr. Gardner did not let the other—the defendants
> know that he was going to be showing excerpts of transcripts to the jury
> before his closing.[58]

Donnelly's counsel then resumed his closing argument, immediately stating, "Thank

you, Your Honor.  I, frankly, didn't know there was such an agreement, but my

apologies, if putting up testimony does something that harms you guys in some way, but

that certainly was not my understanding."[59]

In the order denying a new trial, the court acknowledged it should not have

admonished Donnelly's counsel, but that "it was not a significant event in light of all of

the proceedings":

---

[55] Id. at 239.

[56] See id. at 241.

[57] CP at 8979.

[58] RP (Oct. 9, 2014) at 3010.

[59] Id.

The court incorrectly admonished plaintiffs' counsel during closing argument. It was, however, a very mild admonition and was not significant in light of over three weeks of proceedings before the jury. A party is not entitled to a perfect trial, only a fair trial. That is what plaintiffs received. The court allowed almost all of plaintiffs' evidence, excluded over defendants' objection a good part of the evidence defendants sought to introduce, and provided a set of jury instructions which allowed plaintiffs to argue their theory of the case to the jury. The jury simply did not agree with the plaintiffs.[60]

"When a trial court evaluates occurrences during trial and their impact on the jury, great deference is afforded the trial court's decision."[61]

We agree the admonishment was mild, and there is no showing of prejudice. As to the denial of a new trial, the court acknowledged it was mistaken about the agreement, but that it had no impact on the jury. We conclude the trial court did not abuse its discretion.

## V. MISCONDUCT BY DEFENSE COUNSEL

The trial court denied the defense's request for a superseding cause instruction, but inadvertently left the clause referring to superseding cause in Instruction 15 on proximate cause.[62] When the court read Instruction 15 to the jury before closing arguments, neither party objected to the inclusion of the term in the instruction. Donnelly acknowledges that any challenge to the instruction itself has not been preserved.[63] Instead, he contends defense counsel committed prejudicial misconduct by referring to superseding cause in closing argument.

---

[60] CP at 9691.

[61] Dickerson v. Chadwell, Inc., 62 Wn. App. 426, 433, 814 P.2d 687 (1991).

[62] See CP at 8906; RP (Oct. 8, 2014) at 2743-45.

[63] See Appellant's Br. at 24.

But Donnelly did not object to this reference in closing; he raised the issue for the first time in his motion for a new trial. And "'absent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is *so flagrant that no instruction could have cured the prejudicial effect.*'"[64]

The defense made no actual argument regarding superseding cause during closing.[65] Defense counsel only argued that the sole proximate cause of Donnelly's injuries was the Department's failure to comply with its own safety rules and program.[66]

---

[64] M.R.B. v. Puyallup Sch. Dist., 169 Wn. App. 837, 854, 282 P.3d 1124 (2012) (emphasis added) (quoting Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 94, 231 P.3d 1211 (2010)).

[65] Defense counsel made only two brief references to the superseding cause language during closing:

> I do want to touch upon two of the instructions that you have in your packet. Instructions 15 and 16 that deal with proximate cause, and then this issue of sole proximate cause, which we assert the blame for this accident falls on the Department of Corrections.
>
> Proximate cause is one of those things that, from the day I was a first-year law student, still makes my brain hurt. When you read that phrase, "a cause in a direct sequence unbroken by any superseding cause," I still don't get it really well.
>
> But what it boils down to is connecting dots, that there is an unbroken sequence of events that is foreseeable, that leads from someone doing something wrong to that's the reason why that person got hurt.
>
> And so when you are evaluating the evidence and considering this concept, the proximate cause, you will have to decide not just did someone—did my client HDR, did Turner, did Noise Control—were they negligent? That is, did they do something that violated the standard of care? But was that negligence a proximate cause, a direct—what's the phrase?—a direct sequence unbroken by any superseding cause? Because you can't find any of us negligent, liable, responsible unless you find that direct, unbroken sequence.

RP (Oct. 9, 2014) at 3088-89.

[66] See RP (Oct. 9, 2014) at 3105.

21

And the jury was never told the legal meaning of "superseding cause." Therefore, a curative instruction telling the jury to disregard the term could have solved the problem had Donnelly timely objected.

### VI. INDEPENDENT CONTRACTOR RULE

Finally, Donnelly argues the trial court erred when it ruled that under the independent contractor rule, HDR and Turner could not be held liable for any negligence of Noise Control in the installation of the Lockdown ceiling in the Unit South building. Donnelly also claims his construction management expert witness Del Bishop should have been allowed to testify as to his opinions about Turner's "right and obligation to supervise the work of a subcontractor like Noise Control."[67] But the jury found no negligence by Noise Control. Therefore, we need not reach these issues.

Accordingly, we affirm.[68]

WE CONCUR:

_____

_____

_____

---

[67] Appellant's Br. at 42.

[68] Because we affirm, we do not address Turner's assignment of error on cross appeal.